**Earl M. GRECO et ux.**

v.

**Philip S. MANCINI, Sr., et al.**

No. 81–277–Appeal.

Supreme Court of Rhode Island.

May 31, 1984.

Joseph V. Cavanagh, Jr., Jeffrey C. Schreck, Edwards & Angell, Providence, for plaintiffs.

Stephen C. Mackie, Thomas L. McDonald, Almonte, Lisa & Pisano, Providence, for defendants.

OPINION

KELLEHER, Justice.

This Superior Court litigation involves "problem real estate," a high water table, and a registered professional engineer whose negligence or deviousness gave rise to the problem that belongs to the plaintiffs. On July 30, 1973, the plaintiffs, Earl M. Greco and his wife Antonetta, agreed in writing to purchase from Continental Land Co. for $12,700 a lot of land situated on Forest Lane in East Greenwich and described in various documents as lot No. 4 on the Chessbrook Plat. The Grecos paid a deposit of $1,000, and the balance of the purchase price was to be paid on or before August 27, 1973, upon the delivery of the warranty deed. The sales agreement contained a provision indicating that the impending sale was subject to proof of "satisfactory percolation tests." The land company is a family corporation. The family in question is the Mancini family, which includes a father and two sons. One son, Philip S. Mancini, Jr., is the registered professional engineer to whom we have just alluded. On August 16, 1973, the title closing was held, and a warranty deed conveying title to lot No. 4 and bearing the signatures of Philip S. Mancini, Jr., and his wife, Janet, was delivered to Mr. and Mrs. Greco.

Since the only parties to this appeal who testified at the Superior Court trial were the plaintiff husband, Earl M. Greco, and the defendant engineer, Philip S. Mancini, Jr., we shall hereinafter refer to "Greco," and, where appropriate, this reference will include his wife; and our subsequent references to "Mancini," where appropriate, will also encompass the other defendants.[1]

Greco, who is a building contractor, testified that when he signed the sales agreement that was prepared by Mancini's broker, he expressed some doubt that he could proceed to build a house on the lot without having any concern about water problems. The percolation proviso found in the sales agreement was a result of this expression of anxiety. At the closing, which was held at the office of Mancini's attorney, Mancini assured Greco that there would be no water problems. He also volunteered to draw up a plan for a proposed septic system and to attend to all the preliminary details that had to be dealt with before Greco could begin construction of his home. Among those details was the obtaining from the State Health Department's Division of Food Protection and Sanitation (the division) its approval of the proposed septic system.

Mancini acknowledged that in the early part of 1971 he had acquired an undeveloped parcel of land now known as Chessbrook Plat. Before a proposed subdivision of the parcel, which indicated six lots, could be approved by the East Greenwich authorities, it was necessary to submit to the division for its approval the results of percolation tests and a ground-water evaluation conducted on the parcel. On June 2, 1971, the division received a document entitled "Subsoil Exploration Report" which related to Chessbrook. The report, which is set forth on a form supplied by the division, was prepared by Mancini, who as a licensed professional engineer certified that his examination was in conformity with the division's rules relating to location, design, and construction of individual sewer systems. The report indicated that, in order to determine the level of ground water on the parcel, Mancini had dug five holes, four of which came up dry and the fifth of which indicated water at a depth of

1. The involvement of Philip S. Mancini, Sr., Mancini's father, in the sale to Greco was minor. At the time Greco entered into the agreement for the purchase of the lot, title to the property was in the names of Philip S. Mancini, Sr. and his wife.

seven feet. When representatives of the division made an onsite inspection, they discovered that the holes dug by Mancini had been covered up. Additional holes were dug when the division's representatives were present, but the viewing occurred at a time when the wet season of the year was on the wane.

The division's approval of Mancini's proposed subdivision was subject to the condition that the septic tanks and leaching fields servicing the six houses within the subdivision be built in the front yard of each lot. There is no question that the division, in its initial acquiescence to Greco's construction efforts, was relying on the representations made by Mancini in his "Subsoil Exploration Report." [2]

In his initial design for Greco's sewer system, Mancini had placed the system in the front yard. However, Greco wanted the system located at the side of the house because all of the plumbing lines exited at this point. Mancini, in acquiescing to this request, never informed Greco about the division's front-yard stipulation.

Greco began building his new home in April 1974, and in doing so he installed a system that modified considerably the design originally formulated by Mancini. Later, in May 1974, at Greco's request, the division appeared at the building site to give final approval to the system. However, an on-the-spot examination of the ground-water conditions showed a substantial difference between what Mancini had reported and what was actually present. Ground water was found eighteen inches below the surface of the soil rather than at the seven-foot depth previously reported by Mancini. The leaching field would have been awash had the installation been permitted to continue.

Consequently, the division suspended the permit that it had previously issued. The suspension date was May 30, 1974, and

Greco was instructed not to use the system. A new system was designed with the help of the division and was installed in the summer of 1975. The cost of the new installation was approximately $3,100. The new system utilized a device that is described by its manufacturer as a residential submersible sewerage ejector, which pumps the waste up to a leaching field that is located above the level of Greco's home.

In suing Mancini, Greco sought damages on several theories. One was negligence, another was fraud, and the third was breach of contract. He also sought recovery from the state for its alleged negligence in issuing the permit to Mancini. A Superior Court justice, in his bench decision, absolved the state from any wrongdoing, but after finding that Mancini had made false or incorrect representations to Greco which were intended to, and did, induce him to purchase the property, he ordered that judgment be entered against Mancini in the amount of $11,500 plus interest and costs.

In his appeal, Mancini raises four issues, three of which relate to alleged abuses of discretion on the part of the trial justice, and a fourth that charges him with applying an incorrect measure of damages in arriving at the $11,500 figure.

The first supposed abuse of discretion occurred when two witnesses whose expertise in the appraisal of real estate is unchallenged by Mancini testified. Both appraisers had been practicing their specialty, appraisal of real estate, for over thirty years. Their activities during this time also included the selling of real estate, much of it located in the area of East Greenwich and its next-door neighbor, the city of Warwick.

The trial justice in his decision described the house that Greco had built as a "large, beautiful, well appointed" home. The experts testified that they unquestionably would agree with the trial justice's descrip-

2. Mancini's original proposal was for a plat that contained six lots. However, because of an objection by one of the abutting property owners, the subdivision was amended so as to add a

seventh lot. This alteration required a subsequent submission to the division in 1972, but the 1972 submission was still being supported by the data contained in the 1971 report.

tion, but they would also describe Greco's residence, notwithstanding its grandeur, as a "problem home." A problem home to the experts could be one that is located near an airport, or one with a cellar in which a sump pump stands ready should the sump begin to fill with ground water, or a home that shows water spots on its ceilings. All such structures have problems, whether they may be categorized as (a) noise, (b) a pump, or (c) a leaky roof. Both experts agreed that such problems at best depreciate the fair market value of the subject real estate, it being their unanimous belief that buyers will not purchase unless they get a "little break" in the purchase price, to wit, a 10 percent reduction. In the experts' view, Greco's home has a pump problem. The pump is concealed in the submersible sewerage ejector, and its continued operation guarantees that living, for those in the Greco household, will be pleasant. However, the experts equate the ejector's pump with a cellar sump pump and a buyer's corollary concern that at some unexpected time the waters will rise but the pump will not function.

Mancini's complaint is that there is no factual predicate from which the experts base their 10 percent diminution-in-value factor. We disagree.

The gist of one expert's testimony was that there might be prospective buyers who would immediately walk away upon being notified about the pump, but he expressed the belief that there were many more who, for a 10 percent reduction in price, would cease to be dubious buyers and become willing ones. The other expert made it quite clear that, in his opinion, a buyer seeking to purchase such property as Greco's house would buy it after a little bit of give and take between the buyer and the seller, with the bargain ending up being struck at the 10 percent level.

■ We are well aware that an expert's testimony must be predicated upon facts legally sufficient to provide a basis for the expert's opinion. *State v. Fogarty*, R.I., 433 A.2d 972, 977 (1981). We are also well aware that the determination of the competency of an expert to testify is a matter that lies within the sound discretion of the trial justice, but the record is clear that the experts presented testimony that the houses to which we have referred are subject to a diminution in value, and the percentage of the diminution in this case was well documented.

■ Mancini faults the trial justice for accepting the conclusions of another one of Greco's experts, a registered professional engineer whose academic achievements include a master's degree in civil and environmental engineering, who testified that Mancini's 1971 testing and his 1973 leaching-field design did not comport with reasonable engineering standards. According to Mancini, the expert's conclusions should have been disregarded because they were based on "guessing" and "assumptions." An objective reading of the expert's testimony indicates that his conclusions about Mancini's negligence are based upon tests the expert performed, a study of the rainfall data compiled by such organizations as the National Oceanographic and Atmospheric Administration, as well as the division's records that related to the Chessbrook Plat, including Mancini's "Soil Exploration Report." From these sources, the experts concluded that the water table on Chessbrook Plat had remained constant through the years, including the annual wet season.

■ Any inconsistencies and concessions elicited during cross-examination affected only the weight that the trial justice might have given the expert's testimony, but not its admissibility. *Pray v. Narragansett Improvement Co.*, R.I., 434 A.2d 923, 928 (1981). The trial justice's reliance on this expert was amply justified.

■ The third abuse of discretion occurred, in Mancini's opinion, when the trial justice, after all sides had rested, permitted Greco to reopen the case so that his second real estate expert could testify. In seeking to reopen, Greco pointed out that his first

expert's appraisal was based upon a 1980 value, whereas the critical question was the value of the parcel in 1975, when Greco's "beautiful, well appointed" home acquired its "problem" status. The issue of reopening, as we have so many times stated, is a matter to be resolved by the trial justice in his discretion. Having in mind the purpose of the reopening, we cannot say that he abused that discretion.

■ Finally, Mancini argues that the trial justice erred in selecting the measure of damages. Mancini contends that the true proper measure of damages in this case was the cost involved in the installation and maintenance of the submersible sewerage ejector rather than the reduction in the fair market value of the property. In *Tortolano v. DiFilippo*, 115 R.I. 496, 503, 349 A.2d 48, 52 (1975), the court noted that, as a general rule, when the damage to real estate is temporary, the cost of repair is a proper measure of damages, but when the damage is permanent, the diminution-of-value standard should be employed. The record clearly indicates that the Greco real estate falls within the problem category described by the real estate experts, and its market value is and will be subject to the 10 percent discount factor. In light of this evidence, the trial justice applied the correct standard.

Mancini's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.

SHEA, J., did not participate.