In re Alfred SALVATORE, Jr. and
Rhonda Salvatore, Debtors.

Americo BUCO and Rosemarie
Buco, Plaintiffs,

v.

Alfred SALVATORE, Jr. and Rhonda
Salvatore, Defendants.

Bankruptcy No. 8300209.
Adv. No. 830139.

United States Bankruptcy Court,
D. Rhode Island.

May 2, 1984.
On Motion for Reconsideration
Jan. 28, 1985.

See also, Bkrtcy., 33 B.R. 85.

248

Bruce E. Vealey, Mandell, Aisenberg & Goodman, Ltd., Providence, R.I., for plaintiffs.

Stephen Mills, Warwick, R.I., Z. Hershell Smith, Di Sandro-Smith & Associates, P.C., Inc., Providence, R.I., for debtors.

## DECISION DETERMINING DEBT TO BE NONDISCHARGEABLE

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on February 17, 1984, on the complaint of Americo and Rosemarie Buco to have an alleged debt[1] to them declared nondischargeable. At issue is whether Alfred and Rhonda Salvatore intentionally misrepresented the adequacy of the water supply to their property in order to induce the Bucos to purchase the house at 55 Golden View Drive, Johnston, Rhode Is-

land, and if so, the extent of the damages sustained by the Bucos as a result of said misrepresentation.

The testimony is extensive, and much of it is in sharp conflict, but the following is this Court's summary of the relevant evidence.[2] The Bucos, who were interested in purchasing a house, were first shown the subject property on March 22, 1978 by a real estate broker, Margot Jackson, who informed them that the property was serviced by well water. During that visit there was some brief discussion between Mrs. Salvatore and Mr. Buco regarding the premises and the water supply, but nothing extensive, as Mr. Salvatore was not at home. The Bucos liked the house, however, and on March 29, 1978, agreed to purchase the property for $36,000. (Defendants' Exhibit No. 8, Purchase and Sale Agreement.) On May 21, 1978, the Bucos made a second visit to the property. On that occasion both Mr. and Mrs. Salvatore were present and spoke with the Bucos about the house in general, and also specifically with respect to the adequacy of the water supply. The Bucos assert that they purchased the property in reliance on statements of assurance by the Salvatores that the well produced 7 gallons per minute. The closing took place on June 13, 1978, and on June 24, 1978 the Bucos moved into the house.

The day after they moved in, according to the Bucos, they were completely without water. They immediately contacted ABC Drilling Co., Inc., which, after determining that the well serving the property was inadequate, drilled a second well and installed an additional storage tank. (Plaintiff's Exhibit No. 2, Invoice dated August 30, 1978.) Notwithstanding these improvements, the Bucos contend that the water supply is still inadequate.

### PLAINTIFFS' POSITION

According to the Bucos, the water supply was of concern to them because they had

---

1. Claim No. 1 in the amount of $65,000 on debtors' Schedule A-3 List of Unsecured Creditors is listed as "disputed".

2. This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052.

been warned by a friend that the Bishop Hill area, where this house is located, had a reputation for poor wells. The Bucos testified that during the March 22 visit to the property, Mrs. Salvatore represented that the well output was "seven gallons per minute." Mr. Buco testified that on the May 21 visit, he again inquired about the well productivity, and that Alfred Salvatore stated that the well produced "seven gallons per minute." Buco asserts that he was satisfied with the Salvatores' assurances, especially after their real estate broker, Margot Jackson,[3] confirmed that seven gallons per minute "sounds about right." The Bucos did not learn that the output of the well was actually only one quart per minute,[4] until the well went dry shortly after they moved into the house.

According to the well experts who testified for both the plaintiffs and the defendants, water output at a rate of one quart per minute would be insufficient to supply the average needs of a family of four (the Salvatores and their two children). Even the defendants' expert testified that although it was "possible" to live with a well producing one quart per minute, "adjustments in consumption patterns" would be necessary.

## DEFENDANTS' POSITION

The defendants' version of the facts is quite different: they had "no problems," had "all the water they wanted," and made no representations to the Bucos concerning water output from the well.[5] All of the testimony to this effect is rejected as being neither credible nor reasonable.

3. The Bucos have brought a lawsuit in Providence County Superior Court against Margot Jackson and the firm of Kelly & Picerne by whom she was employed.

4. Because they were completely without water, the Bucos contacted John Lathram, a well specialist. Lathram informed them that the records of Roy Jaswell & Son, Inc., the contracting firm which had drilled the well, indicated a well output of one quart per minute. (Defendants' Exhibit No. 7, Roy Jaswell & Son, Inc. records.)

It is most significant that within four months of moving in, the Salvatores were trying to sell their newly constructed house. We cannot conclude, as defendants contend, that they decided to sell only because of the long commute to work,[6] and that this decision was totally unrelated to any alleged water problem. The distance to work may not be claimed to have come as a surprise to either defendant. The testimony of a disinterested neighbor supports the more plausible reason for the move. Virginia Sinape, of 51 Golden View Drive, testified to a conversation with Mr. Salvatore concerning the possibility of blasting to increase the output of his well. When Ms. Sinape informed him that the neighbors would probably object to the blasting, Salvatore allegedly replied: "How can they expect me to live in a house without water?" This admission of Salvatore's knowledge of/and dissatisfaction with water supply to his property is much more believable than the version of the facts propounded by the defendants. On the evidence presented, the Court concludes that insufficient water was the primary cause for the Salvatores' decision to move. The commuting distance, a minor factor, was an afterthought in the context of this proceeding.

## DETERMINATION OF DISCHARGEABILITY

Section 523(a)(2)(A) of the Bankruptcy Code provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

.    .    .    .    .

5. Rhonda Salvatore claims that the Bucos never asked her about the well. Alfred Salvatore testified that he may have said "six gallons per minute" to Mr. Buco, but that he was referring to the flow from the faucet, not well output.

6. Rhonda Salvatore testified that her commute to work from Johnston to Coventry was twenty-eight miles.

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, . . . .

Under this section, the creditor must establish by clear and convincing evidence [7] that

there . . . exist(s) a false representation by the debtor which is known to be false and which was made with the intent to deceive the creditor. Further, the creditor must have reasonably relied upon the false representation and sustained a loss as a result. (citations omitted.)

*Raimi v. Kalinowski (In re Kalinowski),* 27 B.R. 114, 116 (Bankr.M.D.Fla.1983). *See also Brant v. Zangrilli (In re Zangrilli),* 1 B.R. 717 (Bankr.D.R.I.1979); 3 Collier on Bankruptcy ¶ 523.08 (15th ed. 1983). Applying the law to the instant facts, we find: 1) that the Salvatores had knowledge of the water problem; 2) that they intentionally misrepresented the situation; 3) that the Bucos reasonably relied on the false representations; and 4) that the Bucos sustained damage. The reasons for each of these findings and/or conclusions are discussed below.

## (1) *Knowledge of the Water Problem*

According to all of the well experts, a well producing one quart per minute is considered insufficient, particularly here, where the storage tank capacity was only 44 gallons. The experts agree, in general, that wells in Bishop Hill, an area with known water problems, yield an average of one to three gallons per minute. Thus, one quart per minute is far below normal, even in a neighborhood with notoriously low-yield wells.

The Bucos testified that until the installation of the second well, they could not take consecutive showers or flush toilets more than once a day without running out of water. This testimony, together with that of the well experts and the Salvatores' neighbor, Virginia Sinape, satisfies the Court that the Salvatores had actual knowledge of severe water problems while they were selling their house to the Bucos.

The Salvatores insist that they never had to conserve, and had all the water they needed. The Court accepts the testimony of the experts, that, typically, well users have lower expectations concerning water supply than do public water users; notwithstanding this distinction, we find incredible the Salvatores' claim that they experienced no water shortage whatever. The credible evidence deduced from the conflicting testimony of the parties, as well as the unanimous testimony of the experts, render this assertion unbelievable. The Salvatores had a water problem and they knew it.

## (2) *Intentional Misrepresentation*

For the debt to be held nondischargeable, there must have been a misrepresentation made with intent to deceive, and that intent may be inferred from the evidence. *Cuneo v. Smith (In re Smith),* 25 B.R. 396 (Bankr.D.Md.1982). The evidence clearly establishes that the prevalence of water problems on Bishop Hill is common knowledge.[8] The Bucos were concerned about the water situation, and made specific inquiries pertaining to the water supply. With Bishop Hill's known reputation for water problems, the Bucos' questions about water supply were addressed to a material fact, and the Salvatores led the Bucos to expect an adequate water supply. We have heard much about gallons, gallons per minute, depth of wells, etc.,[9] but those figures tend more to confuse than to assist in the determination of the issues in this

7. *See In re Barlick,* 1 B.C.D. 412 (Bankr.D.R.I. 1974).

8. Leonard Burns, President of ABC Drilling Co., Inc., stated, based on long experience, that approximately 90% of Bishop Hill properties have water problems. This is one of the few points on which there appears to be no disagreement.

9. The testimony is conflicting with respect to the figures quoted. The Bucos claim that they were quoted 7 gallons per minute. Margot Jackson, the real estate broker, testified that she heard Mrs. Salvatore state "4–7 gallons per minute." Alfred Salvatore stated at one point that he was "never asked."

dispute. The real question is whether the water supply to this house was sufficient to satisfy the average needs of an average family. It clearly was not, and it is the Salvatores' willful concealment of this known and material fact which constitutes the operative fraud, made for the purpose of inducing the Bucos to buy the subject property.

### (3) *Reasonable Reliance*

■ We also conclude that the Bucos acted reasonably in relying on the information provided by the Salvatores. Neither of the Bucos had previously lived in houses serviced by well water, and their prior knowledge about wells was based entirely upon observation of a friend's well, which produced 11 gallons per minute. The Bucos had been warned by that same friend, however, about the water problems in Bishop Hill, and for that reason, were concerned about the water situation in the house they were interested in buying.

It was possible for the Bucos to have obtained information about the well output through sources other than the Salvatores, however. For example, a well output test could have been performed at modest cost.[10] Also, statistics regarding this and all wells are a public record at the Water Resources Board in Providence. (Defendants' Exhibit No. 7, Well Completion Report.) The Court accepts the Bucos' claim that they were unaware of such avenues of inquiry. Although they appear to be prudent people, neither was knowledgeable regarding wells or real estate transactions. *See Davis Co. v. Medow (In re Medow)*, 26 B.R. 305 (Bankr.S.D.Fla.1982) (court may look to creditor's sophistication in determining reasonableness of reliance). Under all the circumstances, it was reasonable for the Bucos to expect the water supply at 55 Golden View Drive to be adequate, relative to conditions in the Bishop Hill area.

### (4) *Damages*

■ It is clear that the Bucos have sustained a compensable loss. We reject, however, the claim that their loss be measured by the difference between the value of the property at the time of purchase and the value it would have had with a plentiful (unlimited) water supply. Although both parties presented evidence on damages through real estate appraisers, it is this Court's opinion that the most reliable method of estimating damages in this case is the so called "cost to cure" method which was testified to by the well experts. The Bucos purchased a home in an area known by them to have poor water supply. They had unreasonable expectations if, even based upon the Salvatores' misinformation, they expected a water supply equal either to public water or well water in an area known for high water yields. In the circumstances of this case, the damages sustained by the Bucos may best be ascertained by figuring the cost to bring their water supply approximately up to that of their neighbors. In this regard, the well experts who testified generally agree that the average water output from Bishop Hill wells is 1–3 gallons per minute. Improvements made by the Bucos since they bought the property have increased the rate from one quart to approximately one gallon per minute. There is testimony that the present rate of water output may be compensated for by the addition of a third storage tank, at a cost of $1,500.

Based on all of the evidence, we conclude that the Bucos are entitled to an award in the amount of $4,300. This includes $2,800 already spent by the Bucos to drill a second well, install a second pump, and a second storage tank, plus the anticipated expense of $1500 to install a third storage tank. These additions will put the Bucos in substantially the same position as their Bishop Hill neighbors.

Accordingly, the claim of the Bucos is determined to be non-dischargeable in the amount of $4300.

Enter judgment accordingly.

### ON MOTION FOR RECONSIDERATION

Subsequent to this Court's May 2, 1984 decision where we held that the "cost to

---

**10.** The testimony is that the cost of a well out-put test is approximately $130–$140.

cure" was the most appropriate and reliable method for determining the damages sustained by the plaintiffs, the Supreme Court of Rhode Island decided the case of *Greco v. Mancini*, R.I., 476 A.2d 522 (1984). The plaintiffs request reconsideration on the issue of damages because of the holding in that case, which required damages to be determined according to the "diminution of value" standard.

In view of the plaintiffs' contention that this Court "did not follow the law on damages to realty," and that our ruling on damages was "without any substantial discussion of the testimony presented by experts ... on diminution of value" (Plaintiffs' Memorandum at 2), we have granted reconsideration.

For the following reasons, however, and after carefully reviewing the record here, as well as the holding of the Rhode Island Supreme Court case which plaintiffs contend supports their position, our rationale and award of damages in the amount of $4,300 remains unchanged.

To begin with, the case of *Greco v. Mancini*, on which plaintiffs rely, is quite different from the one at bar. In *Greco* the purchasers of real estate brought an action against the seller for "negligence", "fraud", and "breach of contract", when they discovered that the high water table required the installation of a sewerage ejection system. The trial court found that the buyers had bargained for property with no water problems and had received, instead, property with poor drainage, and that it was the seller's "negligence or deviousness" that had induced the sale. *Greco v. Mancini, supra* at 523. "Negligence" and "deviousness" are hardly synonymous in the area of bankruptcy dischargeability law, and because we are unable to determine from the language in the *Greco* case whether the court was dealing with fraud, as opposed to negligence, that court's holding that damages must be assessed only by reference to diminution in value should not be binding on this Court.[1]

Also, in determining damages the court in *Greco* was influenced by what it considered to be competent expert testimony that the market value of the real estate in question was approximately ten percent less than the price paid by the plaintiffs, notwithstanding various corrective measures which had essentially cured the problem complained of.

The Buco-Salvatore proceeding is dissimilar in two significant respects: 1) here the buyers were aware that the property in question was located in a problem area where virtually all the homes have poor wells; and 2) the record fails to provide competent evidence which could be the basis for determining damages based on diminution in value.

The Bucos seek damages based upon an alleged misrepresentation by the Salvatores as to the adequacy of the water supply. The evidence does establish that the Salvatores falsely led the Bucos to believe that the water supply from their well would be "adequate." *Buco v. Salvatore (In re Salvatore)*, 46 B.R. 247, at 251 (Bankr.D.R.I.1984). We did not find, however, because there was no evidence to support such a finding, that the Salvatores represented the water supply to be plentiful or essentially unlimited (as is municipal water, for example).

It is significant, on the issue of reasonable reliance, that the Bucos knew that the property in question was serviced by a well, and also that they were aware that the entire Bishop Hill area, where this property is located, is notorious for its low yield wells. Based upon all the evidence, including the well experts' unanimous consensus that approximately ninety percent

---

1. To prevail under 11 U.S.C. § 523(a)(2)(A), a creditor must show by clear and convincing evidence that: (1) materially false representations were made; (2) with the intention of deceiving the buyer; (3) that the buyer reasonably relied on such representations; and (4) that the buyer sustained damages as the proximate result of the representations made. *Pacific Finance Discount Co. v. Whiting (In re Whiting)*, 10 B.R. 687, 689 (Bankr.E.D.Pa.1981); *Brant v. Zangrilli (In re Zangrilli)*, 1 B.R. 717 (Bankr.D.R.I.1979).

of the homes on Bishop Hill are afflicted with well water flow rate problems, we concluded that it was unreasonable for the Bucos to expect a water supply different from, or more plentiful than what they knew anyone else in Bishop Hill enjoyed.

■ We agree, of course, with the general rule that a defrauded party should recover all damages which are the direct and proximate result of the defendant's fraud. *See Estate Counseling Service, Inc. v. Merrill Lynch*, 303 F.2d 527 (10th Cir. 1962). However, in view of our findings and conclusions on the issue of reasonable reliance, the plaintiffs in this case may not be compensated for damages as a result of purchasing property located in what they (and virtually everyone interested) knew was a "problem area." This important difference between the instant case and the *Greco* decision has left us without any direct authority or guidance as to how to manage the issue of damages.

The record indicates that with the improvements made by the Bucos since they acquired the property, and with the addition of another storage tank, the Bucos' water supply would be approximately the same as that of their neighbors. Based on this, we concluded that the so-called "cost to cure" would most fairly compensate the Bucos for the damage they sustained as the result of their reliance on the defendants' misrepresentations.

■ Another problem with the plaintiffs' contention that the proper measure of damages is the "diminution in value" test is that based upon the record, there is no reliable evidence to support the application of that method of valuation. Despite the existence of comparable sales in Bishop Hill, the plaintiffs' expert went outside the area, compared the subject property with homes in areas with plentiful water, and made his adjustments against property located in non-problem areas. The responsibility to produce competent evidence on the affirmative of an issue is with the party asserting such position—not with the Court. *See Harmsen v. Smith*, 693 F.2d 932 (9th Cir.1982), *cert. denied*, —— U.S.

——, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). Expert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion. *See State v. Fogarty*, R.I., 433 A.2d 972, 977 (1981). In the Court's view, the market data used by the plaintiffs' expert was not probative or of assistance in resolving the issues before us, and so we chose not to make it the basis for our decision.

■ Based upon our finding that the Bucos were misled with respect to the well output for the subject property, but not as to the Bishop Hill area in general, the "comparables" used by the plaintiffs' expert are neither relevant nor helpful in determining the damages that proximately resulted from the defendants' fraud. The question is not what position the plaintiffs would be in had they purchased property in an area where well water was plentiful, but what they have actually lost by relying on the defendants' misrepresentations as to the subject property. *See McIsaac v. Huckins (In re Huckins)*, 17 B.R 620, 624 (Bankr.D.Me.1982). The defendants are liable for such damages as naturally and proximately flow from the fraud—but this liability should not include the fruit of unwarranted or unreasonable expectations. *See Smith v. Bolles*, 132 U.S. 125, 10 S.Ct. 39, 33 L.Ed. 279 (1889); *Osofsky v. Zipf*, 645 F.2d 107 (2d Cir.1981) (citing *Smith v. Bolles*); *see generally* Annot., 13 A.L.R.3d 875 §§ 4–6 (1967).

For the foregoing reasons, namely, the requisite standard of proof of fraud under § 523(a)(2)(A) dischargeability actions, and the plaintiffs' failure to introduce competent evidence of diminution of value, we reaffirm our conclusion that on the record in this case, the cost to cure is the most reliable method for estimating damages, and hold, as we did in our original opinion, that such compensation will put the Bucos in substantially the same position as their Bishop Hill neighbors.

Accordingly, the claim of the Bucos is determined to be nondischargeable in the amount of $4,300.

Enter judgment accordingly.