In re Bluford A. MEDLIN, Jr., Debtor.

Ronald C. HARTWIG, Plaintiff,

v.

Bluford A. MEDLIN, Jr., Defendant.

Willie V. LAIRD, Plaintiff,

v.

Bluford A. MEDLIN, Jr., Defendant.

Harold T. YOUNG, Plaintiff,

v.

Bluford A. MEDLIN, Jr., Defendant.

Bankruptcy No. 85–00472.

Adv. Nos. 85–0059 to 85–0061.

United States Bankruptcy Court,
N.D. New York.

Aug. 25, 1986.

Vincent R. Corrou, Jr., Utica, N.Y., for plaintiffs.

Pelland & Sanders, Syracuse, N.Y., for defendant-debtor; Roy Sanders, of counsel.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

The above adversary proceedings, involving as they do common questions of law and fact, were consolidated for trial pursuant to Federal Rule of Bankruptcy Procedure 7042 ("FRBP"), Federal Rule of Civil Procedure 42 ("FRCP"). In each, the plaintiff objects to the dischargeability of a debt due him on the grounds the same was incurred by virtue of debtor Bluford A. Medlin, Jr.'s ("Debtor") allegedly fraudulent representations, in contradiction of 11 U.S.C. § 523(a)(2)(A) ("Code"). The Court

has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2)(I) and 1334, with the following constituting Findings of Fact and Conclusions of Law pursuant to FRBP 7052, FRCP 52.

## FINDINGS OF FACT

Debtor filed his petition for relief under Chapter 7 on June 11, 1985. Obligations to Ronald C. Hartwig ("Hartwig"), Willie V. Laird ("Laird"), and Harold T. Young ("Young") were scheduled in amounts of $4,300.00, $17,700.00, and $9,500.00, respectively. Debtor contends he borrowed these sums from Plaintiffs for gambling purposes, with each Plaintiff fully aware of this intended use. Plaintiffs allege Debtor told them the loans were to be used to repay Debtor's personal obligations, and that they relied on these representations when they advanced the above sums.

On direct examination, Young testified that in August, 1984, all parties hereto were on active duty with the United States Air Force, stationed at Griffiss Air Force Base, Rome, New York. At this time, Debtor asked Young to lend him $10,000.00 so that he could pay off some bills; the money was to be repaid in September, 1984, when Debtor was to receive money from his sister in Massachusetts. Young testified he cashed a $10,000.00 certificate of deposit so as to make this loan, with Debtor in return furnishing an I.O.U..

Further, Young stated that a conference was held between all Plaintiffs, Debtor, and C.E.M. Kovaleski, the parties' senior non-commissioned officer, on March 5, 1985. At this meeting, Debtor admitted that Young's money had been used for gambling. Young turned the Debtor's I.O.U. over to Kovaleski, and was given a new promissory note in return. Thereafter Debtor paid Young $500.00 some time in May or June of 1985.

Young stated he would not have originally given Debtor the money had he known it was to be used for gambling; he further stated he did not know Debtor's intention to use the money for gambling when the loan was made. Finally, while Young knew in August of 1984 that Debtor gambled, he did not know the extent of the gambling.

On cross-examination, Young stated that prior to August, 1984, he had loaned money to Debtor on other occasions, beginning with a $500.00 loan in 1983. Debtor expressed different needs for the earlier loans, (never mentioning gambling), and repaid all amounts borrowed. Young was not sure whether he wrote more than fifteen checks to Debtor, but stated that each loan was between $50.00 and $500.00. During this time, Young was Debtor's senior non-commissioned officer, and he acknowledged Air Force Regulations proscribing such loans to junior grade personnel.

Continuing on cross-examination, Young stated he spoke with Debtor as many as four to five times per week between 1983 and 1985, discussing the "spread" on football games only one or two times throughout either period. Young denied discussing gambling activities or football game betting with Debtor over the phone. Young denied ever selling football "tickets" on base, and specifically denied selling such tickets to a Robert Ladick ("Ladick").

Laird testified on direct examination that he began lending money to Debtor in 1983; two loans were made at this time in total amount of $4,000.00, and these were paid in full. When Laird asked the reasons for the loan, Debtor replied it was to pay "personal bills." Debtor did not go into detail, and Laird made no further inquiry. Laird said he loaned Debtor $4,000.00 in March, 1984 and various loans followed; by June of that year, Debtor was indebted to him in the amount of $14,000.00.

Laird stated he first became aware that Debtor had used the money borrowed for gambling at the meeting with Kovaleski. Prior to that time, he had been aware that Debtor frequented the local off-track betting parlor ("OTB"), but did not know the extent of Debtor's gambling. Laird testified that at the meeting with Kovaleski, he was given a new $18,500.00 promissory note from Debtor to cover all prior loans made, after he turned over to Kovaleski Debtor's prior notes. He further stated

that Debtor thereafter paid $800.00 on the obligation.

On cross-examination, Laird stated it was not unusual for him to loan $2,000.00 without inquiring what the money was for. Laird stated he gave Debtor money on seven occasions between 1983 and 1985, and never inquired what Debtor proposed to do with the same. He testified he accompanied Debtor to OTB three or four times during this two-year period, lending Debtor money on these trips, but himself never placing bets. On direct examination, Laird had stated Debtor placed maximum bets of $20.00 at OTB; on cross-examination, he admitted he did not know the amounts of Debtor's bets.

On February 17, 1985, Laird and his wife, Kay Laird, met at Debtor's home with Metta Medlin, Debtor's wife, and Bonnie Fewtrell, ("Fewtrell") a neighbor. At this meeting, Debtor's gambling was discussed, and Laird was informed that Debtor had gambled away his life savings, incurring substantial debts in the process. Prior to this time, Laird had not spoken with Young regarding any money lent to Debtor.

Plaintiff Hartwick did not testify. His secretary, Antonia Mary Coote ("Coote") stated that on one occasion Debtor came to Hartwick's office for a "closed-door" meeting. Emerging from Hartwick's office after meeting for some time therein, Debtor asked Coote to type a promissory note in the amount of $5,000.00, with Debtor named as obligor and Hartwick as obligee. Debtor volunteered that the note was for some financial obligations, with Coote recalling mention of an automobile debt. Gambling was not discussed. Coote was not a party to the conversation between Hartwick and Debtor, and other than the above, did not discuss the circumstances surrounding the execution of the note to which she was a witness.

At the close of Plaintiffs' direct case, Debtor moved to dismiss Hartwick's complaint on the grounds that the proof submitted was insufficient to sustain the allegation of fraud as to that obligation. The Court reserved decision on this motion.

Debtor testified that between 1983 and 1985, he spoke with Young more than six or seven times a day and at least fourteen times a day on Saturdays and Sundays during football season. The majority of these conversations concerned gambling, as Debtor stated he had begun to borrow money from Young for betting as early as 1982. When the telephone calls were made to their respective residences, their wives would answer, and often talk about "another hot bet".

Debtor stated his betting on football games began in 1982. Young would place bets for both, sometimes $500.00 to $600.00 per game. If Debtor did not have the money, Young would "cover" him. He received ten to twenty different checks from Young, and $4,000.00 to $5,000.00 in cash on at least one occasion. Between 1982 and 1985, Debtor testified there were at least fifty occasions when money passed between them because of gambling. Debtor specifically denied receiving $10,000.00 in cash from Young in August, 1984.

Debtor stated Young sold football "tickets" on the Air Force Base between 1982 and 1984. When Debtor's obligations to Young reached a certain level, the parties had various discussions, with Debtor stating he would pay Young back with money borrowed from his sister. Debtor stated his gambling was well known, with at least 200 of the 500 people in his outfit aware he gambled at OTB and on football games. Prior to February, 1985, when he sought professional treatment for his gambling problem, no one in his family was aware of the extent of his betting. In addition to the sums due Plaintiffs, Debtor testified he gambled away his family savings of $30,000.00, as well as an additional $30,000.00 borrowed from his sister.

United States Air Force Technical Sergeant Robert E. Ladick testified that he purchased football "tickets" from Young at work on "numerous" occasions between 1982 and 1985. Ladick stated it was well known that Young sold tickets on base. He testified on cross-examination that he was a very good friend of Debtor.

Metta Medlin, Debtor's spouse, testified that prior to February, 1985, she was not aware of the extent of Debtor's gambling. Mrs. Medlin testified that Young telephoned her home often during football games. She recalled the meeting at her home in February, 1985, and stated it was the first occasion where she found out the full extent of her husband's gambling. She testified Debtor and Laird went to OTB together on at least one occasion.

Fewtrell, a civilian employee of Griffiss Air Force Base and familiar with the parties herein, stated she was also present at the meeting in February, 1985. She testified that Kay Laird stated that Laird had not worried about losing money they had previously loaned Debtor as he had always paid it back. Kay Laird then added the various loan figures in everyone's presence. Kay Laird stated the money had been used for gambling.

Fewtrell recalled a conversation she had with Young, in her office, a few days after the February meeting. She stated Young was upset, as he had given Debtor money that was to have been used to pay real estate taxes. Young stated he was going to cash in a certificate of deposit to take care of the deficit.

United States Air Force Master Sergeant Donald A. Vanderbent ("Vanderbent"), stationed at Griffiss Air Force Base, testified that he knew the parties. He worked with Debtor in the same office, and was present on numerous occasions when Debtor telephoned Young. These conversations were duty related, and no mention was made of gambling or horses. Vanderbent recalled some conversations regarding football. Vanderbent stated some gambling took place in the office, with some personnel betting $1.00 to $5.00 each week on their team. Vanderbent testified he was not aware of the extent of Debtor's gambling until after February, 1985.

United States Air Force Technical Sergeant William M. Knopec ("Knopec") testified he loaned $600.00 to Debtor on or about March 30, 1984, and was repaid $700.00 on or about April 27, 1984. He stated he heard "rumors" of Debtor borrowing money from others, and while he had never seen money transferred between Debtor and Plaintiffs, he had viewed such transactions between Debtor and others. Knopec testified he learned the full extent of Debtor's gambling in February, 1985.

## CONCLUSIONS OF LAW

Code § 523 provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

 The touchstone for analysis of Code § 523 remains a narrow and strict construction of the exceptions to discharge listed so as not to frustrate the Code's basic policy of giving an honest debtor a "fresh start". *In re Levitan*, 46 B.R. 380 (Bankr.E.D.N.Y.1985); *In re Gallaudet*, 46 B.R. 918 (Bankr.D.Vt.1985). For purposes of Code § 523(a)(2)(A), the scienter element of a claim of false representation or fraud may be inferred from a misstatement of fact which the debtor knows or should know will induce another to make a loan. *In re Kimzey*, 761 F.2d 421 (7th Cir.1985). While the intent to deceive may be inferred from the evidence as a whole, *In re Salvatore*, 46 B.R. 247 (Bankr.D.R.I.1984), there must be proof of the debtor's fraudulent intent as of the inception of the debt. *In re Schwartz*, 45 B.R. 354 (S.D.N.Y.1985); *In re Kiernan*, 17 B.R. 362 (Bankr.S.D.N.Y.1982). Such proof must consist of clear and convincing evidence as to each element of the claimed exception to discharge. *In re McGohan*, 75 B.R. 10 (Bankr.N.D.N.Y.1986)(Gerling, B.J.); *In re Snell*, 74 B.R. 108 (Bankr.N.D.N.Y.1985) (Mahoney, B.J.); *In re Magnusson*, 14 B.R. 662, 667 (Bankr.N.D.N.Y.1981); *In re Rodriguez*, 29 B.R. 537, 539 (Bankr.E.D.N.Y.1983).

Concerning Hartwick's complaint, the record presented does not establish by clear and convincing proof that Debtor's obligation to that party was incurred with fraudulent intent. Indeed, the only disinterested testimony regarding the transaction came from Coote, who was not present during the discussions resulting in the execution of the note. Coote merely prepared and witnessed the execution of the instrument. She knew nothing of Debtor's representations to Hartwick. Hartwick's failure to testify certainly does not aid in the advancement of his claim, leaving as it does only Debtor's statements as to what was said at the meeting. The simple existence of the promissory note, without more, is insufficient to establish that Debtor received money from Hartwick by fraudulent or false pretenses. Judgment is thus to be entered on Debtor's behalf with respect to Hartwick's complaint.

With respect to the complaints of Laird and Young, the Court had the benefit of their testimony as to the circumstances surrounding the financial transactions of the parties. However, the evidence adduced by these plaintiffs fails to establish that Debtor fraudulently induced them to advance the loans. Indeed, the evidence presented indicates a continuous gambling relationship between the parties, a relationship which unfortunately ended with Debtor's luck running out.

The record indicates Debtor's relationship with Young involved a substantial amount of football betting, with a great deal of money changing hands on a weekly basis. While Young testified he would not have loaned Debtor the money had he known it was to be used for gambling purposes, the number of financial transactions between the parties belies an assertion that the sums were to be used for "personal debts". Assuming Young's ignorance of Debtor's true conduct, that the amounts of money and the number of loans made could have continued without some inquiry by Young as to Debtor's claimed obligations, strains credibility. The Court does not believe that Young, for a period of at least two years, loaned money to Debtor without any knowledge that the sums were to be used in Debtor's extensive gambling. Indeed, the record establishes Young's continued involvement in the very gambling activities he claims ignorance of.

As to Laird, again it strains credibility to believe that $17,700.00 would be given in loans with only passive inquiry as to the intended use of the money. Additionally, it appears Laird did not seek earlier payment of the money because Debtor had always been paid back promptly the money received. The record makes clear Laird's knowledge of Debtor's gambling activities, his personal involvement therein, and his acquiescence thereto.

This is a tragic case. It appears Debtor wasted considerable sums of his own, his family, and his (presumably former) friends. But irrespective of the cruel realities the Debtor's illness has for those he associated with, the record does not establish that the loans were made on the basis of Debtor's actionable fraud or false pretenses.

As a consequence of the foregoing, judgment is to be entered on Debtor's behalf dismissing all of the complaints herein.

LET JUDGMENT BE ENTERED ACCORDINGLY.