In re John B. FIKE (Co-owner, Vermont Cabinet Co., Inc.) and Joan S. Fike, Debtors.

BELLOWS FALLS TRUST COMPANY, Plaintiff,

v.

John B. FIKE (Co-owner, Vermont Cabinet Co., Inc.) and Joan S. Fike, Defendants.

Bankruptcy No. 82–179.
Adv. No. 82–0144.

United States Bankruptcy Court, D. Vermont.

June 28, 1983.

Thomas W. Costello, Rutland, for plaintiff.

David F. Buckley, Bellows Falls, for defendants-debtors.

## MEMORANDUM

CHARLES J. MARRO, Bankruptcy Judge.

This matter is before the Court on the plaintiff's complaint, as amended, to determine dischargeability of debt. It apparently is predicated on § 523(a)(2) of the Bankruptcy Code which makes non-dischargeable a debt for obtaining money by the use of a statement in writing (i) that is materially false; (ii) respecting the debtor's financial condition; (iii) on which the creditor to whom the debtor is liable for obtaining such money reasonably relied; and (iv) that the creditor caused to be made or published with intent to deceive.

## FACTS

The debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on July 28, 1982. He listed the plaintiff, Bellows Falls Trust Company, as an unsecured creditor in sums of $18,000.00 and $20,-000.00 by virtue of his liability as co-signer

on two notes "for business of Vermont Cabinet Co., Inc.".

The debtor, prior to the date of filing had been a principal with Rooney Gibbs and George Gibson, in a business conducted by Vermont Cabinet Co., Inc. and which continued to operate until 1981 when it ran out of capital.

On or about July 1, 1980 Vermont Cabinet needed money to meet its payroll and the principals applied to the plaintiff for a loan of $20,000.00 which was processed by Francis E. Romano, the bank's Vice President and Treasurer. He requested the principals of Vermont Cabinet to submit financial statements and, in accordance with this request the debtor, John B. Fike, gave Romano a written statement which he dated July 9, 1980 and in which he included as asset notes receivable amounting to $66,000.00 with a contra liability of notes payable in the sum of $29,000.00 together with real estate consisting of 20A, Reading, Vt. purchased in 1980 at a cost of $20,000.00 and with a then present value of $20,000.00. The financial statement showed that the debtor had a net worth of $79,000.00.

On July 10, 1980 the plaintiff-bank made a "BUSINESS LOAN" to John B. Fike, the debtor, and Rodney L. Gibbs to meet the payroll of their Vermont Cabinet Co. and this was evidenced by a promissory note of the same date in the principal sum of $20,000.00 signed by them and payable 3 months after date with interest at 14.00%. This note carried the notation "Secured by accrual clause in Gibbs Real Estate Mortgage".

The plaintiff made an additional loan of $26,280.00 on August 14, 1980 to be used for payment of electrical work performed for the benefit of the business of Vermont Cabinet and this was evidenced by a promissory note of the same date in said sum of $26,280.00 signed individually by Wm. H. Hennessey, R.L. Gibbs and the debtor, John B. Fike, and payable in six months with interest at 14%.

On August 14, 1980 R.L. Gibbs, Norman Silverdick and the Debtor, John B. Fike, for value received, executed and delivered to the plaintiff a promissory note in the principal sum of $20,000.00 payable in one month after date with interest at 14.00%.

On September 24, 1980 the plaintiff loaned to Vermont Cabinet Co., Inc. the further sum of $14,400.00 evidenced by a promissory note signed by this corporation through its President, John B. Fike, and its Vice President, R.L. Gibbs, and also signed individually by John B. Fike and R.L. Gibbs. This note was payable with interest at 14.50% in monthly installments of $495.66 beginning October 25, 1980 and its payment was secured by a 1979 Dodge Van and a 1979 Chrysler LeBarron. The note also contains this provision: "It is also agreed the bank has the right of setoff against all checking, savings and any form of account".

Rodney Gibbs, one of the principals in Vermont Cabinet and a co-maker of the aforesaid four notes, is a substantial property owner in Bellows Falls, Vermont where the plaintiff bank is located and he is a man of considerable means.

In making the foregoing loans the bank's Vice President-Treasurer was deeply concerned about the continuation of the business in which the debtor had an interest since it was his aim to try to preserve jobs for the area.

The makers have defaulted in the payment of the four notes and there is now due and owing thereon the following:

| Date of Note | Balance due 6/2/83 | Per Diem |
|---|---|---|
| July 10, 1980 | $28,116.16 | $7.67123 |
| August 14, 1980 | 36,591.84 | 10.08 |
| August 14, 1980 | 24,848.87 | 6.90411 |
| September 24, 1980 | 15,115.86 | 4.31861 |
| Total amount due | $104,672.73 | $28,973.95 |

At the time that the debtor gave the bank his financial statement he actually did have a note receivable of the face value of $66,000.00 which he had pledged to the Vermont National Bank for a loan of $29,000.00, leaving him with an equity of $37,000.00. The note receivable of $66,000.00 and the one payable to the Vermont National are accurately reflected in the statement.

In the spring of 1980 the debtor entered into a verbal contract with Wendall and Laura Alexander for the purchase of a parcel of land comprising 17½ acres (shown as 20 acres in the financial statement) situated in Reading, Vermont for the sum of $20,-000.00. He gave the sellers a down payment of $5,000.00 and intended to pay off the balance from the proceeds of a note for $15,000.00 executed and delivered to him and his wife by Gardner and Katherine Smith pursuant to a contract for a deed dated June 8, 1979. This land was purchased for the purpose of erecting a home thereon and, in fact, the debtor did construct thereon an earth-sheltered house, clearing the land, excavating and building a road to the property with the labor being performed by the debtor and his wife during May and June, 1980.

When the financial statement was signed by the debtor on July 9, 1980 the debtor did not have record title to the 17½ acres in Reading but he actually was in a position to acquire legal title by virtue of the down payment and the proceeds of the Smith note. Further, he was in possession of the land and had made considerable improvements thereon prior to the date of the financial statement.

On August 25, 1980 the debtor and his wife executed a conditional assignment agreement with Wendall and Laura Alexander which provided for the assignment of the Smith note to the latter as part of the consideration for the purchase of the Alexander land by Fike and his wife.

On December 23, 1980 Wendall J. and Laura N. Alexander conveyed to the wife of the debtor, Joan S. Fike, the 17½ acres of land in Reading and the deed was recorded on the same date in Book 41, Page 124 of Reading Land Records. The conveyance was made directly to the debtor's wife because of marital difficulties at the time with a possible divorce ensuing and for the financial security of the wife.

The debtor never represented to the bank's loan officer that he had legal title to the land or that he could mortgage it and he was never asked.

The debtor did not pay taxes on the 17½ acres to the Town of Reading in 1980 but there did appear on the Town's Grand List for that year an untyped notation reading: "FIKE, JOHN & JOAN NEW HOUSE 17AC FELCHVILLE."

## DISCUSSION

The plaintiff contends that the debtor's financial statement was false in that he overstated his assets in two respects—i.e. ownership of real estate valued at $20,-000.00 and of notes receivable of $66,000.00; that the debtor intended to deceive and that the plaintiff reasonably relied on the false statement.

This Court does not agree. The note receivable of $66,000.00 with a corresponding offset of a note payable of $29,000.00 was correctly stated and truly represented the debtor's ownership as it existed at the time. There may be some technical failure as to ownership of the Reading land in that the debtor did not have a recorded deed to the premises which would create a legal title. However, under the contract of purchase with a $5,000.00 down payment and the proceeds of a $15,000.00 note with which to complete payment the debtor, as a layman, especially since he was in possession of the property and had performed considerable improvements thereon prior to the date of the financial statement was justified in assuming that the land would be considered as an asset. He testified that he did the best he could in preparing the statement and this Court has no reason to question his credibility.

It is elementary that the vendee under a contract for the sale of land becomes an equitable owner. See 77 Am.Jur.2d 478, § 317 where it is said:

"A contract for the sale of land, part of the purchase price being paid and possession taken, vests in the vendee an equitable title in fee."

As such an owner, the Court finds it difficult to attribute to the debtor an intent to deceive in his listing the real estate as an asset. The lack of such an intent is further

buttressed by the debtor's omissions from his assets of the $5,000.00 down payment under the verbal contract to purchase and the Smith note receivable of $15,000.00. Even disregarding the real estate of $20,-000.00 the debtor's statement still shows a net worth of $59,500.00.

A creditor who objects to the discharge of a debt because of false representations assumes a heavy burden. The frauds included in the portion of Section 523(a)(2) of the Code, upon which the plaintiff relies, are those which in fact involve moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality is insufficient. It must further affirmatively appear that such representations were knowingly and fraudulently made and that they were relied upon by the other party. 3 Collier 15th Edition 523–39 and 523–40 Sec. 523.08(4).

The Courts, under Sec. 17a of the Bankruptcy Act, the forerunner of Sec. 523 under the Code and couched in the same language, have uniformly construed that false pretenses or false representations entail frauds which involve moral turpitude or intentional wrong and not those implied in law. *Underwood v. Ajax Rubber Company, Inc.* 296 S.W. 964, 11 Am.B.R. (N.S.) 488; *In the Matter of Noble,* 42 F.Supp. 684, 48 Am.B.R. (N.S.) 391. See also cases cited under Note 12 3 Col. 15th Ed. 523–39; *Re Thomas,* 12 B.R. 765; *In Re Brown,* 6 B.C. 679, 682; *In Re Liberati* (Bkrtcy.E.D.Pa.—1981) 11 B.R. 54, 55; *In Re Lamb* (Bankruptcy Court W.D.La.—1983) 28 B.R. 462, 464.

The frauds necessary to support non-dischargeability of a debt of the type under consideration are defined in 1A Collier 14th Edition 1634 as follows:

"The frauds included in the portion of clause (2) under discussion are those which in fact involve moral turpitude or intentional wrong; fraud implied in law, which may exist without imputation of bad faith or·immorality, is insufficient. It must further affirmatively appear that such representations were knowingly and fraudulently made, and that they were relied upon by the other party ....."

The Vermont Supreme Court supports the view recited in Collier. *Stroh v. Dumas,* 117 Vt. 13, 17, 84 A.2d 408.

And as pointed out in the case of *In Re Simpson* (Bkrtcy.N.D.Ia.—1983) 29 B.R. 202, 209 "Actual fraud encompasses any deceit, artifice, trick or design .... used to cheat another-something said, done or omitted with the design of perpetrating .... a cheat or deception." Black's Law Dictionary, 595 (rev. 5th ed. 1979).

In addition the burden of proof is on the objecting creditor to establish that the debt comes within one of the exceptions to discharge. *Kreitlein v. Ferger* 238 U.S. 21, 26, 35 S.Ct. 685, 686, 59 L.Ed. 1184; 34 Am.B.R. 862. *In Re Lamb,* supra and this must be done by clear and convincing evidence. *In Re Toleikis* (Bkrtcy.E.D.Mich.1982) 19 B.R. 944; *In Re Vissers,* 21 B.R. 638 (Bkrtcy.E.D. Wis.1982); *In Re Cook* 21 B.R. 112 (Bkrtcy. D.N.M.1982); *In Re Lamb,* supra 28 B.R. at page 464.

It is true that the intent to deceive as the plaintiff contends, may be established by proper inference from the testimony and conduct of the defendant or by proof that the defendant's actions and representations were reckless. However, in the light of the testimony presented in this case, there is no basis for drawing such an inference and the Court is unable to discern any proof of recklessness on the part of the defendant from which to conclude any misrepresentations. On the contrary, the Court is convinced. that the debtor gave to the plaintiff a correct and true financial statement to the best of his ability. Had he listed $20,-000.00 of real estate and, in addition, a $5,000.00 deposit under the agreement to purchase land from Alexander as well as a $15,000.00 note receivable from Smith there might be some basis for the argument that he was overstating his assets. Instead the debtor, in effect, merely asserted that he had a $20,000.00 interest in the real estate with possession and that legal title was to be acquired by virtue of the $5,000.00 down

payment and the proceeds from the $15,-000.00 Smith note receivable.

The plaintiff would have the Court believe that it reasonably relied on the alleged misrepresentations of the debtor as to ownership of the real estate and the $66,000.00 note receivable. The note as indicated supra. has been explained away. It points to the testimony of the loan officer Romano which, it contends, was confirmed by consultant Silberdick. It is true that there was a self-assertion by Romano that he relied on the statement. However, the Court is not convinced that there was such reliance. An examination of the executed notes introduced into evidence reveal that the first one for $20,000.00 carried the notation, "Secured by accrual clause in Gibbs Real Estate Mortgage". The note for $14,400.00, also secured by a 1979 Dodge Van and 1979 Chrysler, recited: "IT IS ALSO AGREED THE BANK HAS THE RIGHT OF SET-OFF AGAINST ALL CHECKING, SAVINGS OR ANY FORM OF ACCOUNT". These notations bear the earmarks of a superabundance of caution usually exercised by a sophisticated banker such as Romano appeared to be on the witness stand. If he exercised such caution with reference to these two notes then why did he not require, at the time the notes were signed, a mortgage on the land claimed to be owned by the debtor or at the very least add to the notes a recitation that they were to be secured by a real estate mortgage to be furnished by Fike as Romano claimed had in fact been promised by the debtor.

The plaintiff makes much of the testimony of Silverdick as confirming that of Romano. Silverdick was a consultant for Vermont Cabinet Co., Inc. and he, at the request of the plaintiff, was Co-maker of the "renewed" note for $20,000.00 dated August 14, 1980. As such it is definitely to his interest that the obligations on the debtor's notes to the plaintiff be declared non-dischargeable. This is not to say that this witness was not trying to tell the truth as he saw it but his testimony does not bear the imprimatur of a disinterested witness.

Long after the defaults on the notes the plaintiff through Romano, and by letters dated February 10 and 25, 1981 vigorously pursued Silverdick, Gibbs and the debtor for mortgages on their property indicating that he needed, "John's Deed for a legal description". It is not unusual for bank loan officers, after loans become sour, to rewrite them or request additional collateral so that they may satisfy the requirements of auditors examining bank loans.

The tone of Romano's letters, after default, to the makers of the notes, including the debtor, dated February 10 and 25, 1981 and which contained such expressions as "I want to get something on record as soon as possible before any attachments are made" and "Please do the right thing and get me off the hook", creates a fair inference that the bank's representative was following suit.

Had the bank relied on the debtor's legal ownership of the real estate when the loans were made it would not have required too much effort to request the deed for preparation of a mortgage as security for the loans at least in part.

This Court is convinced that there was no material misrepresentation in the financial statement submitted by the debtor; that there was no intent to deceive on his part and that the plaintiff did not reasonably rely on it.

In sum, the plaintiff has failed to sustain its burden and the debtor should not be denied his discharge as to his debt to the plaintiff. The complaint should be dismissed with the clear result that the purpose of the Bankruptcy Act should not be thwarted and the debtor given a "new opportunity in life and a clear field for future effort, unhampered by the pressure of pre-existing debt—". *Lines v. Frederick,* 400 U.S. 18, 19, 91 S.Ct. 113, 113–114, 27 L.Ed.2d 124 (1970).

## AS TO ATTORNEY'S FEES

The debtor's attorney, in its request for findings, is also seeking the allowance of $1,000.00 to him as a reasonable attorney's fee, supported by an affidavit show-

ing about 20 hours of services rendered at $50.00 an hour.

Were it legally permissible this Court would be inclined to order the plaintiff to make the requested payment. However, a judgment against a creditor may include a reasonable attorney's fee only if it comes within the purview of § 523(d) of the Bankruptcy Code which reads as follows:

"(d) If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment against such creditor and in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding to determine dischargeability, unless such granting of judgment would be clearly inequitable." underscoring supplied.

The legislative history indicates that the purpose of the provision is to discourage creditors from initiating proceedings to obtaining a false financial statement exception to discharge in the hope of obtaining a settlement from an honest debtor anxious to save attorney's fees. Such practices impair the debtor's fresh start and are contrary to the spirit of the bankruptcy laws.

It should be especially noted that section 523(d) applies only to consumer debts under section 523(a)(2). It has no applicability to any of the other exceptions to discharge found in section 523(a). Nor does it apply to the exception of section 523(a)(2) unless the debt is a "consumer debt" which is defined in section 101(7) to mean a "debt incurred by an individual primarily for a personal family or household purpose." 3 Collier 15 Ed. 523–70.3.

As pointed out by the plaintiff's attorney and as supported by the record in this case the obligations to the bank incurred by the debtor were for business purposes. They do not qualify as consumer debts as defined in § 101(7). As a result the Court under § 523(d) is precluded from, awarding a reasonable attorney's fee to the debtor.

Judgment is being entered in accordance with this memorandum opinion.