In re Thomas H. GALLAUDET, III, and Gail H. Gallaudet, Debtors.

**FORD MOTOR CREDIT COMPANY, Plaintiff,**

v.

**Thomas H. GALLAUDET, III, and Gail H. Gallaudet, Defendants.**

Bankruptcy No. 83–00183.
Adv. No. 84–0002.

United States Bankruptcy Court, D. Vermont.

March 8, 1985.

.Michael J. Marks, of Lisman & Lisman, Burlington, Vt., for Ford Motor Credit Company.

Mark L. Sperry, and James W. Swift, Middlebury, Vt., for debtors.

## MEMORANDUM OPINION

CHARLES J. MARRO, Bankruptcy Judge.

This matter is before the Court on the Amended Complaint of Ford Motor Credit Company, see 40 B.R. 828, to Determine Dischargeability of the debt of Thomas H. Gallaudet, III, and Gail H. Gallaudet, the Debtors, to it. The Amended Complaint is predicated on § 523(a)(2), (4), and (6) of the Bankruptcy Code, which exempts from the discharge the following debts:

"(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—...

"B) use of a statement in writing—

"(i) that is materially false;

"(ii) respecting the debtor's or an insider's financial condition;

"(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

"(iv) that the debtor caused to be made or published with intent to deceive;

"(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

"(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;"

The parties agreed that the issues be bisected with a hearing on dischargeability first and a continued one on damages, if necessary. This Memorandum pertains to the first issue.

## FACTS

The Defendants, Thomas H. Gallaudet, III, and Gail H. Gallaudet, individually and as an officer, director or shareholder of Gallaudet Motors, Inc., a Vermont corporation, filed a Petition for Relief under Chapter 7 of the Bankruptcy Code on September 23, 1983, and, in their Schedules, they listed Ford Motor Credit Company, the Plaintiff, as an unsecured creditor in the sum of $150,000.00 for a business loan to Gallaudet Motors from 6/79—6/83 and this obligation was characterized as "Contingent."

In June, 1979, Thomas H. Gallaudet organized Gallaudet Motors, Inc., a Vermont corporation, for the purpose of conducting a dealership in the sale of new and used automobiles, as well as servicing them. Gallaudet made an original investment of $100,000.00 from money saved by him and borrowed from relatives. From 1980 through 1982, he invested an additional sum of $95,000.00 in the business, which he received from the sale of stock, two Porsche cars, and money borrowed from relatives. From the time that Gallaudet Motors, Inc., was organized until the business was terminated, Gallaudet had made a total investment of $195,000.00 in the business.

The shares of stock in the business corporation were issued in the proportion of 87% to Gallaudet and his wife and 13% to his brother and brother-in-law. Gallaudet at all times was the president and executive officer of the business corporation. The dealership was under the direct and complete control of Gallaudet, who acted as sales manager, service manager, wreck manager and he was involved in everything relating to the business to the point that he even washed cars, controlled sales, controlled the office, and did a bit of everything. Any dealings with the Ford Motor Credit Company were strictly his responsibility. His wife, Gail, first went to work for Gallaudet Motors, Inc., in June of 1981 on a part-time basis. She assisted in the office and received a salary of $100.00 a week, which was continued until January of 1983 when she became office manager and was paid $200.00 a week. She held the titles of secretary and treasurer in the corporation, but she performed merely ministerial duties of a routine nature including the cutting of checks, which she carried out only upon instruction from her husband. She signed some papers in behalf of the corporation, but only when she was requested to do so by her husband. She never carried out any functions in connection with the business without instructions from him.

Tom Gallaudet's salary was fixed at $25,000.00 a year, and it never increased during the entire period of the operation of the business. The dealership suffered a loss of $16,000.00 in 1979, of $88,000.00 in 1980, with a profit of $38,000.00 in 1981 and an apparent profit of $4,000.00 in 1982, but, upon audit, there was a loss of $40,000.00 at the end of 1982. When the business was finally terminated in May, 1983, the Gallaudets had nothing left from their investment of $195,000.00 and at that time did not even own a car.

Shortly after the dealership was formed, Gallaudet Motors, Inc., as a corporation by and through its president, Thomas H. Gallaudet, did on July 3, 1979, execute an Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement with Ford Motor Credit Company, and this provided, in part, under paragraph "5" as follows:

> "Dealer's possession of the merchandise financed hereunder shall be for the sole purpose of storing and exhibiting the same for sale or lease in the ordinary course of Dealer's business.... Any and all proceeds of any sale, lease or other disposition of such merchandise by Dealer shall be received and held by dealer in trust for Ford Credit and shall be fully, faithfully and promptly accounted for and remitted by Dealer to Ford Credit to the extent of Dealer's obligation to Ford Credit with respect to such merchandise."

Further paragraph "7" of this agreement provided:

"All funds or other property belonging to Ford Credit and received by Dealer shall be received by Dealer in trust for Ford Credit and shall be remitted to Ford Credit forthwith. Ford Credit, at all times, shall have a right to offset and apply any and all credits, monies or properties of Dealer in Ford Credit's possession or control against any obligation of Dealer to Ford Credit."

Also, on July 3, 1979, Thomas H. Gallaudet and Gail H. Gallaudet, the Debtors, did execute and deliver to Ford Motor Credit Company a written continuing guaranty under which they as Guarantors jointly and severally and unconditionally guaranteed to Ford Motor Credit Company, its successors and assigns, that the dealer, Gallaudet Motors, Inc., would fully, promptly and faithfully perform, pay and discharge all of the Dealer's present and future obligations without the necessity of the Ford Motor Credit Company first having to proceed against the Dealer or to liquidate paper or any security therefor and to pay on demand all sums due and to become due to Ford Motor Credit Company from the Dealer and all losses, costs, attorney's fees or expenses which it might suffer by reason of the Dealer's default.—

The Wholesale Financing and Security Agreement was mailed by Ford to Gallaudet and he signed it without reading it for the reason that he understood that he was obligated to do so if he wished to receive the dealership. Further, Ford had been delivering cars to him even before he received the agreement. As a result, he was not aware that he was required to pay for the vehicles to Ford Credit promptly after they were sold, and even if he had not received payment himself. It was not until sometime later when James Foley, Field Representative for Ford in charge of auditing, notified Gallaudet of this obligation to make payment promptly.

Prior to June, 1979, when Gallaudet received the dealership from Ford, he had had no previous experience in automobile wholesale financing and Ford made no effort to train or assist him in the procedure to be followed in carrying out the obligations required under the agreement. Ford Credit through its field representative, James Foley, conducted a monthly audit of Gallaudet Motors, Inc., for the purpose of determining whether Gallaudet was complying with the requirements of making payments for vehicles sold pursuant to the financing agreement. On a number of occasions Foley discovered that payment had not been made as required, and he would, in behalf of Ford Credit, accept payment at the time of the audit.

Although the financing agreement provided that the proceeds of any sale received by Gallaudet as dealer were to be held in trust for Ford Credit, he was not required to maintain a separate bank account for deposit of these proceeds, and Ford Credit was fully aware that Gallaudet was depositing the money received from the sale of the cars in his regular checking account and most all of the payments made for the vehicles were by checks on this general account.

Ford Credit was fully aware of the financial distress of Gallaudet Motors, Inc., during practically all of the time that Gallaudet operated the dealership. This was reflected in its credit reviews and reports from which they attempted to analyze the credit rating of the dealership. As early as July, 1980, its report indicates that there was a loss trend and it rated the risk of the dealer as "Poor—This dealer is a problem waiting to happen.—" . . . "Dealer's financial position is poor. I have told dealer he must inject more cash immediately. He claimed that May financial statement was incorrect through bookkeeping and accounting errors." Again in February, 1981, the dealership was rated as poor and the report showed that the account was critical and required very close attention. In July, 1981, the report showed that the dealer continued to pre-bill deals causing violations and that he had lost his bookkeeper and had to hire a new bookkeeper with no previous dealership experience. In September, 1982, the report recited that the dealer was having trouble paying all of his

creditors on time and that he was presently at 181% of wholesale line. The observation was made that the condition was due to two factors, 1982 buildup and poor judgment by the dealer on sale of new cars. The February, 1983, report indicated that that as of 2/10/83 the dealer was $165,000.00 over the credit line and continued to be a high account risk. Ford Credit observed the poor cash flow and weakening position financially overall and suggested that the branch was to be carefully watched as to all future purchasing in an effort to minimize potential losses.

On the basis of credit packages prepared by Ford Credit, as of February, 1982, Gallaudet Motors, Inc., was awarded a line of credit in the sum of $375,000.00 for new cars and $40,000.00 for used cars for a total of $415,000.00. Yet, as of that date, Ford Credit extended to Gallaudet a line of credit of $688,000.00, and this was done in spite of all of the previous reports that the dealership was a poor risk, and on one occasion the account was termed as "critical." The credit packages prepared by Ford Credit were based in part upon financial statements furnished by Gallaudet Motors, Inc., but, in spite of this, the package of September, 1982, was put together with at least four financial statements missing.

As security for any sums owing from Gallaudet Motors, Inc., to Ford Credit, the latter held a second mortgage on 5.76 acres of land on Route 7 in Middlebury, Vermont, owned by Thomas Gallaudet and his wife, Gail. This property was also encumbered by a first mortgage to the Vermont Federal Savings Bank with a third mortgage to one Brush from whom Gallaudet purchased the garage premises. Gallaudet had an agreement with Brush whereby the latter would discharge the mortgage on the land at anytime requested by Gallaudet in exchange for a mortgage on the home premises owned by Gallaudet and his wife. Sometime prior to the fall of 1982, Ford Credit suggested to Gallaudet that he should increase the capital available to the dealership. In an effort to meet the wishes of Ford Credit, Gallaudet listed the property on Route 7 for sale and the several

agents with whom he listed the property suggested that he obtain a release of the mortgage held by Ford Credit. Ford Credit agreed to release the mortgage provided that Gallaudet invested the proceeds received from his equity in the property, which amounted to about $40,000.00, in the business. The Ford Credit mortgage was released and in late October, 1982, Gallaudet borrowed the sum of $40,000.00 from the Chittenden Bank and Small Business Administration, which he invested in the business. As security for this loan, SBA required Gallaudet to execute and deliver to it a mortgage on the Route 7 property. Gallaudet continued to list the Route 7 property for sale at a price of $97,500.00 and, in the event of such a sale, Gallaudet would be able to net the sum of $58,000.00 after payment of the Vermont Federal Bank mortgage, and it was his intention then to invest it in Gallaudet Motors, INC. Gallaudet had an understanding with the Chittenden Bank and SBA that, upon sale of the Route 7 property, the mortgage to SBA would not have to be repaid as long as the proceeds were invested in the business.

This property was appraised by Armand Bicknell, a realtor, and from September, 1982 through May, 1983 it had a continuing fair market value of $100,000.00. When Gallaudet obtained the release of the mortgage from Ford Credit, he fully intended to comply with its request to use the proceeds from the sale of his equity in the property as an additional investment in the dealership, and it was with this in mind that he continued to list the property for sale at $97,500.00, which was less than the appraised value of $100,000.00. However, he received only one offer which amounted to $75,000.00.

Gallaudet Motors, Inc., was obligated to furnish financial statements to Ford Credit on a monthly basis. Gallaudet was unfamiliar with the preparation of such statements, and in order to facilitate the process, he installed a computer system, but the bookkeeper hired to operate it made a number of mistakes on a continuing basis with the result that the financial state-

ments produced were not accurate. Some of them overstated the cash flow of the dealership and certain overdrafts in the checking account of Gallaudet Motors, Inc., were not reflected in the statements. As a result, the statements did not accurately reflect the financial condition of the dealership, but Ford Credit was fully aware of the situation inasmuch as Gallaudet informed the representatives of Ford Credit, Pat Coon, Jack Buckley, and Lindsey Boyd-Robertson, at least 25 times that the computer was "screwed up." In the preparation of these financial statements, Gallaudet had no intention to deceive Ford Credit and the latter did not rely upon them.

Gallaudet had overdraft privileges as to his checking account with Chittenden Trust Company since it held a mortgage on his home premises in which there was considerable equity and the bank felt that it could rely upon this equity as a hedge against any overdrafts in the Gallaudet checking account.

This overdraft privilege with Chittenden Bank was afforded to Gallaudet Motors, Inc., on a month-to-month basis, but in February, 1983, the privilege was temporarily suspended due to the fact that an officer of the bank monitoring the account was on vacation, and as a result, several checks issued to Ford Credit were returned for insufficient funds. Upon the officer's return, the overdraft privileges were reinstated.

From February of 1983 until the closedown of the dealership in May, 1983, Gallaudet Motors, Inc., sold eleven vehicles which were floorplanned by Ford Credit and Gallaudet failed to make payment for these cars. Gallaudet anticipated that payment would be made during the month of April when sales accelerated which would result in increased profits. Gallaudet fully intended to make payment for these vehicles. He never meant to cause Ford Credit any harm. Gallaudet's anticipated sales did not materialize in April. The financial condition of Gallaudet Motors, Inc., deteriorated even more with the result that Gallaudet was under extreme pressure, work-

ing about 60 hours a week in an attempt to salvage his business. About the beginning of May, although his health was impaired, he made efforts to raise additional capital without success, and on May 4, 1983, he and his wife had a meeting with officials from Chittenden Bank and S.B.A., and at that time, the Bank decided to withdraw the overdraft privileges and refused to honor any checks drawn on Gallaudet Motors, Inc., checking account. A decision was made to liquidate all of the assets of the dealership by a sale conducted on the garage premises in which Gallaudet and his wife cooperated fully.

An auction was held on June 9, 1983 at which the remaining assets were sold and the proceeds were retained by Chittenden Bank and the S.B.A. The proceeds from the sale of the 11 vehicles sold "out of trust" were used in the operation of the business of Gallaudet Motors, Inc., and neither Gallaudet nor his wife received any personal benefit from them.

## DISCUSSION

This case presents a classical example of a dedicated and hard working individual attempting to fulfill the American dream by the ownership of a successful business. In spite of his unyielding effort and the constant devotion of his wife the venture turned into a dismal failure. It is apparent from the testimony adduced at the hearings that Gallaudet lacked the business experience and was not afforded the necessary guidance by Ford Credit to cope with the spirited competition which prevails in the sale of automobiles where wheeling and dealing is an accepted art. This was aptly put by the representative of Ford Credit, Lindsey Boyd-Robertson, who after the business failed told Gallaudet's wife, "Tom was too much of a gentleman and that is why the dealership didn't make it." The representatives of Ford Credit who were most sophisticated in the area of wholesale car financing were made aware of Gallaudet's shortcomings very early in the life of the dealership. Yet they made no attempt to offer suggestions to Gallau-

det as to methods of improving the business but in lieu thereof made demands that he contribute more capital. They learned early that there were irregularities and were told at least 25 times that Gallaudet's computer system was "screwed up." As a result the financial statements submitted to Ford Credit were not accurate. Yet Ford Credit, even though it had the right to audit the books, never did so nor did it offer Gallaudet any guidance on how to rectify the situation. It also failed to explain to Gallaudet the necessity of paying for the vehicles floor planned immediately upon sale until sometime after the agreement was executed. It learned early in the operation of the business that Gallaudet was selling vehicles "out of trust" yet it permitted him to make payment when it conducted its audit and to continue in business even though Gallaudet had breached the terms of the security agreement. In effect it lulled Gallaudet into a false sense of security with the result that he could have assumed that he was not guilty of any serious wrongdoing.

■ The Court is greatly impressed with the testimony of both Gallaudet and his wife. Their candor attests their veracity. This is not to impugn the credibility of the witnesses improved by Ford Credit but the overall evidence tends to establish that their recollection of events was faulty. Further, it does not establish that the debt incurred by Gallaudet and his wife under the continuing guaranty agreement is non-dischargeable. Gail Gallaudet did not participate in the management of the corporate business. She performed ministerial functions only and these pursuant to direct instructions from her husband who was in complete charge of every facet of the operation. As a result Gail Gallaudet, the co-debtor in this proceeding, is entitled to a discharge without consideration by the Court of any of the exceptions to discharge under § 523 upon which Ford Credit relies.

■ If Ford Credit is to prevail against Thomas Gallaudet it must establish by clear and convincing evidence every element of the exceptions, i.e., (2), (4) and (6) of § 523(a). *In Re Cerrato* (Bkrtcy.S.D.N.Y.1983) 31 B.R. 444, 448; *In Re Callery* (Bkrtcy.S.D.N.Y.1980) 6 B.R. 527, 529; *In Re Schwartz* (Bkrtcy.S.D.N.Y.1985) 45 B.R. 354, 357. The frauds included in the portion of Section 523(a)(2) of the Code, upon which the plaintiff relies, are those which in fact involve moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality is insufficient. It must further affirmatively appear that such representations were knowingly and fraudulently made and that they were relied upon by the other party. 3 Collier 15th Edition 523–39 and 523–40 Sec. 523.08(4). See also *In Re Fike* (Bkrtcy.D.Vt.1983) 31 B.R. 760, 763.

■ It is clear from the evidence that the financial statements furnished to Ford Credit were inaccurate due to computer malfunction, that Ford Credit was fully aware of the situation, that it made no attempt to obtain accurate statements and that there was no reliance upon them by Ford Credit. It has failed to meet its burden under this exception.

■ Ford Credit's position under § 523(a)(4) is also untenable. The evidence does not establish that Gallaudet was guilty of fraud or defalcation while acting in a fiduciary capacity. In the recent case of *In Re Banister* (2d Cir.CCA 1984) 737 F.2d 225, 11 C.B.C.2d 128, 132 the Second Circuit pointed out that section 17(a)(4) of the Bankruptcy Act (the forerunner of § 523(a)(4) of the Code) has limited application to technical trusts and not those which the law implies from contract. Citing *Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 208, 11 L.Ed. 236 (1844); *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 at 333, 55 S.Ct. 151 at 153, 79 L.Ed. 393 (1934); *Upshur v. Briscoe*, 138 U.S. 365, 375–76, 11 S.Ct. 313, 316–17, 34 L.Ed. 931 (1891); *Hennequin v. Clews*, 111 U.S. 676, 682, 4 S.Ct. 576, 579, 28 L.Ed. 565 (1884). The Court quoted from *Davis*, supra, 293 U.S. at page 333, 55 S.Ct. at page 153 as follows:

"It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto."

The Court further observed:

"As we have ruled in rejecting non-dischargeability under section 17(a)(2) the financing agreements did not create an express obligation requiring Northern Yachts to hold in trust for Wachovia the specific proceeds of inventory sold."

In *Davis,* supra, Justice Cardozo congently remarks at page 334, 55 S.Ct. at page 154:

"It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto ... Was petitioner a trustee in that strict and narrow sense?

"We think plainly he was not, though multiplicity of documents may observe his relation if the probe is superficial ... The resulting obligation is not turned into one arising from a trust because the parties to one of the documents has chosen to speak of it as a trust."

See also Colier on Bankruptcy 15th Edition § 523.14, pages 523–14, 115; *In Re Paley* (Bkrtcy.E.D.N.Y.1981) 8 B.R. 466, 3 C.B.C.2d 648; *In Re Falk of Bethlehem, et al.,* (Bkrtcy.D.N.J.1980) 3 B.R. 266, 270; *First National Bank of Enosburg Falls v. E.E. Bamforth,* 96 A. 600, 90 Vt. 75, 79.

The fact that a commercial agreement contains the word "trust" does not make the agreement a trust agreement nor does it create a fiduciary relationship. *Lord's, Inc. v. Maley,* 356 F.2d 456, 458 (7th Cir. 1965) cert. denied 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966); *Falk of Bethlehem, et al.,* supra, at 270; *In Re Paley,* supra, 8 B.R. 466, 3 C.B.C.2d at 650. It is the character of the debt relationship and not its form that determines whether a fiduciary "trust" relationship exists. *Davis v. Aetna Acceptance Co.,* supra, 293 U.S. at

334, 55 S.Ct. at 154; *In Re Paley,* supra, 8 B.R. 466, 3 C.B.C.2d at 650.

The pertinent provisions in the Wholesale Financing and Security Agreement executed by Ford Credit and Gallaudet Motors, Inc., do not meet the litmus test for an express or technical trust. Even though it provided that the proceeds were to be held "in trust" for Ford Credit the document was nothing more than a commercial agreement which contained the word "trust." This conclusion is buttressed by the fact that the agreement did not provide nor did Ford Credit require Gallaudet Motors, Inc., to segregate the proceeds received from the sale of the floor-planned vehicles and to deposit them in a special account for the benefit of Ford Credit. On the contrary, Gallaudet Motors, Inc., deposited these funds in its regular checking account with the full knowledge of Ford Credit and without any disapproval by it. During the entire existence of the dealership payments were made to and accepted by Ford Credit by checks drawn on the regular checking account of Gallaudet Motors, Inc. In sum, an express or technical trust did not exist and a fiduciary relationship was not created. On the contrary a creditor-debtor relationship resulted from the commercial agreement with the word "trust" executed by the parties.

In addition, if Ford Credit is to prevail under § 523(a)(4) it must establish that the funds received from the sale of the floor-planned vehicles were in fact used by Gallaudet for his personal benefit. *In Re Banister* (2d Cir.C.C.A.1984), supra, 737 F.2d 225, 11 C.B.C.2d at 132. The undisputed evidence is that money so received was used by Gallaudet in the operation of the corporate business and that when it was finally terminated he had personally suffered a loss of $195,000.00 without the benefit of even owning a car at that time. Ford Credit has not established that the debt is excepted from discharge under § 523(a)(4).

Finally, Ford Credit maintains that Gallaudet converted, the proceeds re-

ceived from the sale of the 11 cars sold out of trust resulting in a willful and malicious injury by Gallaudet to Ford Credit and making the debt non-dischargeable under § 523(a)(6).

There is no unanimity of opinion among the courts as to what constitutes a willful and malicious conversion. Some cases have construed "willful and malicious" rather loosely and have adopted the common law definition of implied or constructive malice, rather than the rigid standard of actual, subjective, conscious intent to harm. *In Re McCloud* (Bkrtcy.M.D.Tenn. 1980) 7 B.R. 819, 3 C.B.C.2d 701; *In Re McGiboney* (Bkrtcy.N.D.Ala., S.D.1981) 8 B.R. 987; *In Re DeRosa* (Bkrtcy.S.D.N.Y. 1982) 20 B.R. 307. These courts have, in effect, retained the same meaning for the term "malicious" as was ascribed to it under § 17a(2) of the Bankruptcy Act. See *Tinker v. Colwell* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754. The Second Circuit rejected such a loose interpretation of "willful and malicious." In the most recent case of *In Re Banister* (2d Cir.C.C.A.1984) 737 F.2d 225, 11 C.B.C.2d 128 the floor-planning agreement, like the one in the instant case, did not create an express obligation to hold separate and remit the specific proceeds received upon sale of an item of inventory to the Wachovia Bank as secured party. In view of this the Court held that the failure of the debtor to turn over the proceeds to the bank did not constitute a willful and malicious conversion. The Banister Court pointed out that before it could determine whether Banister's conduct was sufficiently "willful and malicious for purposes of the federal non-dischargeability standard," see e.g. *Tinker v. Colwell*, 193 U.S. 473, 485–87, 24 S.Ct. 505, 508–09, 48 L.Ed. 754 (1904) it must decide whether, at a minimum, Banister committed the tort of conversion under relevant state law. *Banister*, supra, 737 F.2d 225, 11 C.B.C.2d at 130. Inasmuch as under New York state law there was no conversion under the facts in Banister the Court did not reach the further federal law question of whether a conversion would have

been "willful and malicious" within the meaning of § 17a(2) of the Bankruptcy Act.

The Court observes that in this state a "conversion" consists in appropriating another's property to one's own use, or its destruction, or in exercising dominion over it in exclusion or defiance of that other's rights, or in withholding the possession from him under a claim inconsistent with his rights. *Manley Bros. v. Boston & M.R.R.*, 97 A. 674, 90 Vt. 218; *Peck v. Patterson*, 125 A.2d 813, 119 Vt. 280.

Further, it has been held that the sale of mortgaged personal property by the mortgagee constitutes a conversion which may be barred by a discharge in bankruptcy. *Mason v. Sault*, 108 A. 267, 93 Vt. 412. This case was decided under the old Bankruptcy Act and was interpreting § 17a(2).

However, the Court is unable to find a Vermont case which specifically relates to a willful and malicious conversion arising as a result of a breach of a floor-planning agreement and construing § 523(a)(6) of the Bankruptcy Code. It is also noted that the *Banister* case, supra, was decided by the Second Circuit under the Bankruptcy Act which permitted a more liberal and loose interpretation of "willful and malicious." *Banister*, however, did cite 737 F.2d 225, 11 C.B.C.2d at page 132, 3 Collier § 523.16 at 523–129 n. 37 (15th Ed.1984) with approval for the proposition that "mere failure to pay over money received from the sale of secured property does not show willfulness or malicious conversion." See *In Re Graham, Jr., et als.* (Bkrtcy.D. Nevada 1980) 7 B.R. 5, 2 C.B.C.2d 695; *In Re Hodges* (Bkrtcy.W.D.Va.1980) 4 B.R. 513, 2 C.B.C.2d 566 holding that under the Bankruptcy Code malice requires a specific intent to do harm and can no longer be implied as under prior law. And in *United States of America v. Langer* (U.S. District Court D. North Dakota 1981) 12 B.R. 957, 7 B.C.D. 1323 (Complaint dismissed where there was no showing that debtors intended to financially harm the United States and therefore harbored no malice.)

The legislative history of § 523 clearly indicates that the loose and liberal interpre-

tation of former section 17a(2) of the Bankruptcy Act was not to be applied to Code § 523(a)(6). See House Report No. 95–595 at page 365 U.S.Code Cong. & Admin.News 1978, pp. 5787, 6320–6321 reading as follows:

> "Paragraph (6) excepts debts for willful and malicious injury by the debtor to another person or to the property of another person. Under this paragraph, "willful" means deliberate or intentional. To the extent that *Tinker v. Colwell*, 139 [193] U.S. 473 [24 S.Ct. 505, 48 L.Ed. 754] (1902), held that a looser standard is intended, and to the extent that other cases have relied on Tinker to apply a 'reckless disregard' standard, they are overruled."

The Senate made the same observation. See S.R.Rep. 95–989 at page 79.

Consistent with the foregoing legislative history of § 523 the Court is convinced that it was incumbent upon Ford Credit to establish that there was an actual conscious intent on the part of Gallaudet to harm it by failing to make payment for the 11 cars that were sold out of trust. See *In Re Finnie*, (Bkrtcy.D.Mass.1981) 10 B.R. 262; *In Re Gentis*, (Bkrtcy.S.D.Ohio 1981) 10 B.R. 209, 213; *In Re McLaughlin* (Bkrtcy. N.D.Ga.1981) 14 B.R. 773.

Having failed to establish a willful and malicious conversion, Gallaudet should not be denied a discharge pursuant to the exception under § 523(a)(6) of the Code.

In sum, Ford Credit, under the facts in this case, has failed to prove that Gallaudet should be denied a discharge under either subparagraph (2), (4) or (6) of § 523(a). This conclusion is further supported by the established rule that an exception to the discharge should be strictly construed against the objecting creditor and liberally in favor of the debtor. Any other construction would be inconsistent with the liberal spirit that has always pervaded the entire bankruptcy system. 3 Collier 15th Ed. § 523.05A, page 523–15. See also *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *Neal v.*

*Clark*, 95 U.S. 704, 5 Otto 704, 24 L.Ed. 586 (1877).

In accordance with the basic purpose of the Bankruptcy Act, the debtors should be granted a discharge so that they are given "new opportunity in life and a clear field for future effort, unhampered by the pressure of pre-existing debt—." *Lines v. Frederick* 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970).

The Clerk is instructed to enter judgment dismissing the Complaint and, in view of this, the issue of damages has become moot, and there is no necessity for further hearing.