In re Steve O. Z. FINKEL,
Debtor. (Two cases)

GOOD LEASING, INC.,
Plaintiff-Appellant,

v.

Steve O. Z. FINKEL, Defendant-Appellee.
(Two cases)

BAP Nos. NC–81–1028–GVL,
NC–81–1059–GVL.
Bankruptcy No. 4–79–03471HS.
Adv. No. 4–80–0192AH.

United States Bankruptcy Appellate Panels
of the Ninth Circuit.

Argued Sept. 17, 1982.

Decided May 18, 1982.

Allen M. Garfield, Garfield & Rhine, San Francisco, Cal., for plaintiff-appellant.

Bill H. Lampi, Hayward, Cal., for defendant-appellee.

Before GEORGE, VOLINN and LASAROW, Bankruptcy Judges.

**18**

OPINION

GEORGE, Bankruptcy Judge:

Before the Panel, by way of two consolidated appeals, is a question of whether the trial court erred in assessing the extent of the nondischargeable debt owed to the appellant by the appellee-debtor in these proceedings. We AFFIRM the trial court's judgment.

## I. BACKGROUND

Sometime before 1977, the appellee, Steve Q. Z. Finkel, became interested in converting a restaurant facility into a discoteque. Prior to that time, Mr. Finkel had dealt with the appellant, both personally and as general manager of a business entity known as Richardson Security Company, in the lease of a number of motor vehicles. In dealing with Good Leasing, Inc., [hereinafter "Good Leasing"] Mr. Finkel had worked primarily through one John Cross, an agent of the appellant.

In anticipation of the need to finance his discoteque operation, Mr. Finkel approached Mr. Cross with the idea of obtaining funds from the Good Leasing. (Mr. Cross was subsequently given some $2,000 by Mr. Finkel, ostensibly for having provided his services as an intermediary in this series of transactions.)

Three "sale and lease-back" agreements were eventually entered into between the above-named parties. Only the first of these agreements is of concern to the Panel at this time. Under this first agreement, Good Leasing advanced some $50,000 to the appellee through one Harold E. Mackenthun, who had been employed by Mr. Finkel to do the construction work on the project. Prior to making such an advance, however, two distinct bills of sale were issued. First, on February 15, 1977, Mr. Mackenthun gave Mr. Finkel a $50,000 bill of sale for the kitchen equipment to be purchased with the advance. Then, on February 28, 1977, Mr. Finkel gave Good Leasing a $50,000 bill of sale for the same equipment. Finally, on March 1, 1977, Good Leasing issued Mr. Mackenthun a check for the $50,000 amount, and Mackenthun endorsed the check over to Mr. Finkel. Thereafter, Good Leasing "leased" the kitchen equipment back to Finkel on a 36-month fixed-term lease.

On November 1, 1977, the lease was renegotiated, with an agreed value being given the subject equipment of $68,999.36. Mr. Finkel was credited, at that time, with having paid $2,838.06 on the earlier lease.

The evidence presented at trial supports the appellant's contention that the subject equipment was never worth anything near the $50,000 initially set as its value by the parties or the $68,999.36 established in the renegotiated lease. Moreover, the equipment was in used condition and its title had never been in the appellee's name. In the latter regard, some evidence exists that the equipment either belonged to the owner of the real property on which it was located or to a prior lessee of the said real property. In any event, the equipment was eventually sold by Mr. Finkel and the proceeds from that sale were utilized by him.

Subsequently, Mr. Finkel defaulted under his lease and went into bankruptcy. Good Leasing, by way of its present complaint, seeks to avoid the discharge of this debt.

Three arguments of law and fact were presented before the trial court on behalf of Good Leasing's complaint. First, it was maintained that a conspiracy had existed between Finkel, Cross, and Mackenthun to defraud Good Leasing in the obtaining of the funds in question. Second, the appellant argued that Mr. Finkel obtained these funds as the result of a fraudulent misrepresentation as to the title, value, and condition of the equipment which formed the subject matter of their sale and lease-back agreement. Finally, Good Leasing claimed that, in any case, Mr. Finkel willfully and maliciously converted the said equipment.

After entertaining evidence in this matter, the trial court reasonably chose to treat the agreements between these parties as loans to the debtor, secured by the "leased" kitchen equipment. The trial court then found that the appellant's conspiracy theory had not been proven. The trial court, however, further stated as follows:

"Defendant represented the kitchen equipment to be his and to be worth $50,000. Whether it was his or not is immaterial because none of the plaintiff's loss can be attributed to lack of title in defendant. Plaintiff had a right to rely on the stated value of the kitchen equipment to the same extent it did on the stated values of the other property sold and leased. Had the property been worth $50,000, new, and had it been retained by defendant, it would have brought in the same proportion of salvage value as the other property.

"To the extent defendant intentionally disposed of property of plaintiff, he is liable for nondischargeable conversion. To the extent he willfully misrepresented the value of the kitchen equipment, he is guilty of nondischargeable fraud. In either case, the measure of damages is the salvage value of kitchen equipment as described if new."

Based upon this damages holding, the trial judge then determined that a) the collateral of the appellant relating to the second and third loans had brought some $17,351.00 when sold, b) this latter property had been valued at $122,858 by the parties at the time of the loan, and c) the moving and related expenses involved in selling the kitchen equipment would probably have cost the appellant about $1,200, in any event. Taking the ratio of the actual salvage value of this later collateral to its value as estimated by the parties, i.e., $17,-351.00: $122,858.00, or 14%, and multiplying this percentage times $50,000, the trial judge arrived at the hypothetical "salvage" value of the kitchen equipment subject to the first agreement, if new, or $7,000. From this figure, the trial court subtracted what would have been necessary liquidation expenses of $1,200, to arrive at his final damage figure of $5,800.

## II.  ISSUE

The issue, as set forth in the appellant's opening brief, is whether the trial court erred in determining the amount of the nondischargeable debt which the court found to have been incurred by actual fraud and willful and malicious injury to property.

## III.  ANALYSIS OF THE FACTS AND THE LAW

Two fundamental arguments are made by the appellant in support of its position in these appeals. These arguments correspond with the trial court's dual bases for finding liability under the appellant's complaint. In the second of these arguments, the appellant maintains that the true measure of damages for conversion is the loss in the value of the property in question on the date it was converted, not its "salvage" value, if new.

Although the Panel agrees with the appellant's statement of law concerning the time for measuring damages based upon the tort of conversion, it follows the trial court in holding this issue to have been raised unnecessarily. California's standard measure for damages arising from a wrongful conversion action is found in section 3336 of the California Civil Code:

"The detriment caused by the wrongful conversion of personal property is presumed to be

First—The value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and

Second—A fair compensation for the time and money properly expended in pursuit of the property."

The facts of this case indicate that the kitchen equipment used as collateral in this transaction was never worth its "agreed" value $50,000—the value now sought by the appellant. Rather, it was used equipment worth, according to the testimony of various parties, very little or nothing when removed from the appellee's premises. Moreover, the appellant has not alleged or proven any special damages aris-

ing solely from the conversion of the property now in question. Therefore, the measure of damages suffered by the appellant, as a result of the appellee's conversion, would seem to be less if made, in terms of its real value, on the date of the conversion, than if made at a later date, deeming the equipment to be new. The trial court's decision, based primarily upon the claim of false representation, actually provided the appellant with more than it would have received under its claim of willful and malicious conversion, alone.

■ The question of fraud in the inducement of the Good Leasing-Finkel loan is somewhat more troublesome to the Panel. The thrust of the appellant's position is that it was induced to advance Mr. Finkel the initial $50,000 upon the supposition that the collateral for this loan was worth $50,000. If this is true, then the proper measure of damages suffered by the appellant because of this fraud would arguably be the total amount of the loan made in reliance upon such misstatements.

Nevertheless, reliance is a key element in determining the nature and extent of a false representation. See 3 Collier on Bankruptcy ¶ 523.08[4], at 523–40 through 523–41 (15th ed. 1981). But see Zaretsky, "The Fraud Exception to Discharge Under the New Bankruptcy Code," 53 Am.Bankr. L.J. 253, 258 (1979) (reliance by creditor not necessary under 11 U.S.C. § 523(a)(2)(A)); In re Reinhart, 1 B.C.D. 666 (E.D.Va. Bkrtcy.1975) (not requiring reliance in section 17(a)(2) case under the old Bankruptcy Act). In particular, when a misrepresentation concerns the value of collateral property, questions often arise as to the nature and extent of the secured creditor's reliance upon a debtor's false statement of that property's value. In such cases, the creditor has frequently relied upon a number of factors in making his loan decisions. Such factors most often include not only the represented worth of the collateral, but also the past credit record of the borrower, the use to which the total loan proceeds are to be placed, and the estimated ability of the borrower to repay the underlying obligation.

■ In the instant case, for example, the appellant argues that "but for" the debtor having supplied it with collateral allegedly valued at the total amount of the loan in question, it would not have advanced the $50,000 to Mr. Finkel. That is to say, it claims that its reliance was based entirely upon its supposed ability to recover against this kitchen equipment. Nevertheless, the trial court apparently found that the appellant's reliance upon the collateral in question was only to the extent of the amount which it could have reasonably expected to recover through an execution upon that collateral. Additional reliance by the appellant in making the entire $50,000 loan was placed upon the past dealings with the parties, Mr. Finkel's general credit record, and the potential return expected from the debtor's discoteque operation. There is no argument of misrepresentation with respect to these other factors. Therefore, the trial court held that all that the appellant could claim to have been denied by the debtor's misrepresentations was the amount it relied upon obtaining in the event an execution upon its collateral proved necessary.

The panel finds that there is sufficient evidence in the trial record to support such a finding. Good Leasing was not new to the business world. There was testimony of a common knowledge in the kitchen equipment business that goods of this sort were custom-fitted to each facility and that their resale value was accordingly limited. No evidence existed that a misrepresentation was made as to this fact or that any misunderstanding existed on the part of the appellant in this regard. The trial record further supports the trial court's underlying assumption that the appellant relied upon much more than this collateral in making its loan. Therefore, the panel finds the trial court not to have been clearly in error in finding that the appellant's reliance upon Mr. Finkel's misrepresentation was limited to the greatly-reduced value it would have received pursuant to an execution upon its collateral, if new. In the latter regard, the formula utilized by the trial court seems to

have represented a reasonable attempt to arrive at just such an amount. We find no error in the use of this measure of damages.

AFFIRMED.