In re Colburn W. WOOD, Debtor.

Henry STRUNK and John Sustare, Plaintiffs,

v.

Colburn WOOD, Defendant.

Bankruptcy No. 84–00647.
Adv. No. 85–0076.

United States Bankruptcy Court,
N.D. New York.

March 12, 1987.

Robert A. Schuh, Syracuse, N.Y., for plaintiffs.

J. Michael Forsyth, Syracuse, N.Y., for defendant.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

On August 5, 1985, Colburn W. Wood ("Debtor") filed his petition for relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 101–151326 ("Code"). On Octo-ber 29, 1985, Henry Strunk ("Strunk"), and John Sustare ("Sustare") (collectively "Plaintiffs"), filed an adversary complaint objecting to dischargeability of an obligation due them based upon Code § 523(a)(4). An evidentiary hearing was held on August 13, 1986 and the parties were afforded an opportunity to submit evidence and cross examine. The matter was subsequently submitted for decision after counsel were afforded an opportunity to submit memoranda of law.

Strunk testified that in 1978, both Sustare and he were shareholders in a closely held New York corporation known as Eco-Works Collective, Inc. ("Collective"). Other shareholders of this corporation were Robert Grinrod ("Grinrod"), Francis LaSala ("LaSala"), and Richard Kornbluth ("Kornbluth"); these individuals have not appeared in these proceedings. At this time Strunk knew that Debtor, Larry Borsa ("Borsa"), David Dominic ("Dominic"), and Brantley Deaton ("Deaton") were the shareholders of a closely held New York corporation known as Four Way Energy Misers Contractor, Inc. ("Energy Misers"). Both corporations were involved in the business of installing residential and commercial foam insulation. Collective needed marketing and management experience, and thus merger plans were discussed some time in the fall of 1978.

Strunk testified that a "de facto" merger of the corporations thereafter took place, with Debtor suggesting that an "install now, pay in six months" public offer be made as a means of increasing sales. Strunk recognized the risk involved in such a plan as it jeopardized cash flow. Strunk stated this concern led to delegating to Debtor the responsibility of approaching various lending institutions, and determining whether such contracts could serve as collateral for operating loans. The delayed payment program was eventually initiated, and Strunk said he assumed that Debtor had fully investigated the financial considerations proposal.

In March, 1979, cash flow problems began. Strunk questioned Debtor and discovered that he had not contacted any banks.

As there was no money coming in, the salaries of the principals were terminated. Debtor believed the problem was temporary, and suggested the principals could commit their personal assets to the business, and receive additional shares in the corporation.

Strunk testified he thought it proper to get out of the business prior to committing his personal assets, and urged the others to liquidate in an orderly fashion, rather than invest further monies. Sometime in April or May, 1979, Strunk left the business.

On April 7, 1979, a promissory note was executed, payable to the order of Collective. This note was purportedly executed by Debtor, Dominic, and Deaton as obligors, and Strunk stated it was given as part of a buy-out of the original Collective shareholders. Upon receipt, Collective assigned the note to its original individual shareholders.

Strunk testified he relied on all three signatures on the note because he knew that Dominic and Deaton had been the "money men" in Energy Misers. He said he would not have accepted the note had it contained only the Debtor's signature. The note was given to settle all claims between the parties, particularly claims Strunk had against Debtor.

Strunk testified that some time after the merger, Debtor received a corporate loan from the Bank of New York for $50,000.00, on which the new corporation Ecoworks, Inc. ("Ecoworks") was obligated. Strunk believed this to be the only loan to Ecoworks during its short existence.

On cross-examination, Strunk stated that LaSala had represented Collective during the initial merger meetings, and that the only Energy Miser personnel he met were Debtor and Borsa, although he thought there were other principals. The two corporations operated together for some time prior to execution of a formal written "Memorandum of Understanding" ("Memorandum") on or about November 9, 1978 ("Exhibit A"). The Memorandum recited that the parties were to form a new corporation (Ecoworks), with the shareholders of each corporation to arrange to transfer either inventory and/or equipment to Ecoworks. All shareholders were also to transfer the sum of $1,000.00 each to Ecoworks as working capital. Additionally, Debtor, Borsa, Dominic and Deaton were to pay $40,000.00 to Collective or its shareholders. $20,000.00 of this amount was to have been transferred on the date of the Memorandum's execution, with the balance paid over a two year period. Payment was to be secured by a promissory note personally signed by the Energy Misers shareholders, who were to further pledge their interests in Ecoworks as additional collateral security.

Strunk stated that after the "merger", all individuals save Dominic and Deaton were involved in the "operational" decisions of Ecoworks, but these two were expected to be part of any "financial" decisions. On a daily basis, Strunk characterized himself as a manager of the working operations, with Borsa and Debtor acting as overall managers of operations, sales and advertising.

Borsa disappeared from the business operations in the fall of 1978, after Strunk executed an unidentified document prepared by Borsa. Apparently, the original Collective shareholders had been disappointed with Borsa's performance; Debtor had not shared these concerns.

When Strunk quit the business, he directed a letter to Ecoworks customers, explaining he was no longer associated with the business, and expressing concern with the quality of the work performed by the operation. Upon his departure, Strunk took a truck and an infrared probe used by Ecoworks in its business; Strunk stated he individually owned this equipment, and had only leased it to Ecoworks.

Sustare's testimony served to flesh out that of Strunk. Sustare was a Collective machinist and crew chief when Debtor initiated the merger discussions. Debtor had represented his belief that a merger would result in Ecoworks becoming the dominant insulation installer in the Syracuse, New York area; the anticipated growth would be due to Borsa's management skills, and Debtor's sales expertise.

After moving to a site previously occupied by Energy Misers in Clay, New York, the principals began discussing the delayed payment program, as well as other promotional schemes, some time in December, 1978 or January, 1979.

Sustare testified that the delayed payment program was implemented by Debtor without approval of the other principals, yet he was aware it was being done. The promotion resulted in Ecoworks signing quite a few insulation contracts, yet because no money was being paid for the work completed, the company was soon unable to meet its payroll. It was then Debtor suggested that each principal put new capital into the corporation in return for new stock.

Sustare did not like this proposal as it would make him a minority shareholder. This suggestion, as well as the dismal state of business, prompted him to quit Ecoworks in March, 1979.

Sustare testified that Debtor signed the note, and then was to take it to Dominic and Deaton to obtain their signatures. The next time he saw the note, it contained the "signatures" of all three. Sustare reaffirmed Strunk's testimony that the note was that evidence of indebtedness referred to in the Memorandum, and that he was relying upon the signatures of Dominic and Deaton when he accepted the assignment of the note from Collective.

Debtor testified that Energy Misers began operating in the foam insulation business in late 1977. When business expanded to the point where demand outstripped capacity, and as Debtor had heard good things about Collective, he approached the principals of that company with the merger proposal.

Debtor confirmed that Dominic and Deaton did not attend any of the early merger meetings. Debtor stated he informed the collective shareholders that while these individuals were financially involved with Energy Misers, they took no active role in that corporation's operations. It was Borsa and Debtor which actually ran Energy Misers, as Dominic and Deaton were only investors.

Debtor stated that during the course of Energy Misers' operations, he frequently signed Dominic and Deaton's names to legal documents such as real estate purchase offers. Debtor testified that neither party objected to the fact that he had signed their names to the note until they became involved in the lawsuit.

The dramatic reduction in Ecoworks' business was related in large part to certain formaldehyde regulations for foam insulation issued by the federal government. To counteract the public's apprehension concerning foam insulation generally, Debtor proposed the delayed payment program.

Contrary to the Plaintiffs' assertions, Debtor stated he had reached an agreement with Key Bank that the lender would make loans to homeowners based on signed insulation installation delayed payment contracts. Key Bank was to give homeowners some sixty days before payments would begin on these loans. Debtor testified that this loan arrangement was presented to the other Ecoworks principals in great detail. Debtor also contacted the Bank of New York regarding special loan arrangements, but an agreement was not reached.

Debtor testified that he had discussed with Key Bank the use of delayed payment contracts as collateral for a direct operating loan to Ecoworks, but that the lender wanted personal guarantees from the shareholders as additional security. Debtor stated he discussed this proposal in detail with the other shareholders, and it was rejected.

Soon after the merger, Debtor had arranged for a line of credit with the Bank of New York in the amount of $50,000.00. The primary shareholders personally guaranteed this obligation; Debtor was not sure whether Dominic and Deaton also incurred personal liability. Debtor stated he never represented to the Plaintiffs that there was not outstanding liability of Ecoworks for which the primary seven shareholders were personally liable.

In 1980, the Plaintiffs and Grinrod filed suit against Debtor, Dominic, and Deaton

in New York Supreme Court for Onondaga County seeking a $16,490.00 judgment for default on the note. Also sought was a $100,000.00 judgment against Debtor alleging fraud and breach of fiduciary duty in his capacity as an officer of Ecoworks. Debtor denied the allegations, and filed a $100,000.00 counterclaim against the Plaintiffs for fraud in the inducement, breach of contract, and breach of fiduciary obligations as officers, shareholders, directors, and employees of Ecoworks.

By Order dated July 23, 1981, ("Exhibit 2"), the Supreme Court dismissed the Plaintiff's cause of action against Deaton and Dominic. Summary judgment had been granted on these parties' behalf because they had not personally signed the note. As for the action between Plaintiffs and Debtor, the same was settled prior to trial by a stipulation entered into late in July, 1983 ("Exhibit 8"). The stipulation provided for 1) Plaintiffs' release of all claims and obligations against Debtor; 2) the transfer of Plaintiff's Ecoworks stock to Debtor; and 3) Debtor's Confession of Judgment to Plaintiffs in the amount of $8,000.00. By affidavit executed July 28, 1983 ("Exhibit 9"), Debtor confessed to judgment as outlined, stating that it was for a debt arising out of his execution of the note. Additionally, on February 9, 1984, Debtor executed a "Hold Harmless Agreement" ("Exhibit 7") by which he agreed to hold the Plaintiffs and Grinrod harmless from any and all liability for creditor's claims against or related to the business activities of Ecoworks. Exhibits 7 to 9 were transferred between the Plaintiffs and Debtor as evidenced by the correspondence of their attorneys. ("Exhibits 5 and 6").

Debtor testified that he truly believed his state court counterclaim had merit. He said he would have pursued the matter further, but the death of his attorney, coupled with new counsel's unfamiliarity with the case, forced him to settle.

Debtor testified that Ecoworks had "shareholder" meetings on a weekly basis, but that it was rare for Deaton or Dominic to attend. Debtor stated that the other six shareholders knew he spoke for Deaton and Dominic on business matters, and that all were aware of his apparent authority. Debtor stated that it was his understanding that the note was issued pursuant to the Memorandum, even though the obligations differed in the amount of $3,000.00.

Debtor admitted he signed Deaton's and Dominic's names to the note ("Exhibit 1"). He stated under oath that he had not specifically received Deaton's permission to sign the note, but that he had previously signed Deaton's name on occasion. Previously, Debtor had testified that while he never told Plaintiffs that he signed Deaton's and Dominic's names to the note, he never told them that he didn't.

The Court took judicial notice of the provisions of New York Penal Law § 170.10 (McKinney 1975, Supp. 1987).[1] Neither Deaton or Dominic testified.

## CONCLUSIONS OF LAW

Plaintiffs contend that Debtor's execution of the note in the names of Deaton and Dominic constitute a fraud upon them. The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and § 157(b)(2)(I).

■ As the Court has recognized, allegations of the nondischargeability of debts must be substantiated with clear and convincing proof. *See e.g. Dawley v. Gould (In re Gould)*, 73 B.R. 225 (Bankr.N.D.N.Y. 1987) (Gerling, B.J.); *S.E. Nichols v. McGohan (In re McGohan)*, 75 B.R. 10 (Bankr. N.D.N.Y.1986) (Gerling, B.J.); *Waterbury Community Fed. Credit Union v. Mag-*

---

1. N.Y. Penal Law § 170.10 provides in relevant part:

> A person is guilty of forgery in the second degree when with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument which is or purports to be, or which is calculated to become or to represent if completed:

> 1. A deed, will, codicil, contract, assignment, commercial instrument ... or other instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status; ...

nusson (In re Magnusson), 14 B.R. 662, 667 (Bankr.N.D.N.Y.1981). A strict and narrow construction of the exceptions to discharge under Code § 523(a) is warranted to avoid frustrating the Code's basic policy of giving the poor but honest debtor a "fresh start". Congress Financial Corp. v. Levitan (In re Levitan), 46 B.R. 380, 383 (Bankr.E.D.N.Y.1985); Ford Motor Credit Co. v. Gallaudet (In re Gallaudet), 46 B.R. 918, 927 (Bankr.D.Vt.1985).

■ In order to sustain a finding that a debt is nondischargeable due to fraud, false pretenses, or false representations, the creditor must show he provided money to the debtor, or otherwise parted with an item of value, based upon a materially false statement or representation upon which the creditor relied. Each element of fraud must be shown.

■ Consequently, the creditor must prove the debtor had the intent to deceive. Hartwig v. Medlin (In re Medlin) 74 B.R. 726 (Bankr.N.D.N.Y.1986) (Gerling, B.J.). This intent must be shown to exist at the debt's inception. Seepes v. Schwartz (In re Schwartz), 45 B.R. 354, 357 (S.D.N.Y. 1985); In re Kiernan, 17 B.R. 362, 365 (Bankr.S.D.N.Y.1982). The debtor's fraudulent intent may be inferred from a misstatement of fact which the debtor knows or should know will induce the creditor to act. First Nat. Bank of Red Bud v. Kimzey (In re Kimzey), 761 F.2d 421, 424 (7th Cir.1985). The evidence taken as a whole may divulge a debtor's deceptive intent. Buco v. Salvatore (In re Salvatore), 46 B.R. 247, 250 (Bankr.D.R.I.1984). Circumstantial evidence may also be relied upon. Lesser v. Jewel Factors Corp., 470 F.2d 108, 110 (2d Cir.1972); New York Credit Men's Adjustment Bureau, Inc. v. Adler, 2 B.R. 752, 756 (S.D.N.Y.1980). It is insufficient, however, to merely show that the debtor left unfulfilled a prior representation or promise. Seepes v. Schwartz (In re Schwartz), supra; Thomas v. Ashley (In re Ashley), 5 B.R. 262, 266 (Bankr.E.D. Tenn.1980).

In addition to proving the debtor's fraudulent intent, the creditor must prove that he relied upon the representations to his detriment. Good Leasing, Inc. v. Finkel (In re Finkel), 21 B.R. 17, 20 (Bankr.App. 9th Cir.1982); Hurlbert v. Drake (In re Drake), 5 B.R. 149, 151 (Bankr.D.Idaho 1980).

The record before the Court is replete with Plaintiffs' allegations that Debtor fraudulently signed the names of Deaton and Dominic to the note. Further, the evidence tends to suggest that Plaintiffs relied upon the veracity of the signatures when they accepted the note as part of the obligations due them under the Memorandum.

■ But what is not clear is whether or not Debtor was authorized to sign Deaton's or Dominic's name to to the note in the first instance. In this regard, the record is silent. The Plaintiffs have not presented proof that Debtor acted without authority. The testimony of either Deaton or Dominic would have gone a long way in evidencing Debtor's alleged fraudulent intent at the time he executed the note. The fact that Debtor signed the other names to the note is, standing alone, insufficient to sustain a finding of an intent to defraud the Plaintiffs. Debtor contends he was authorized to sign, Plaintiffs contend he was not. What is lacking is any evidence which bears the plaintiffs' allegations out.

While some weight may be given the order of the New York Supreme Court which dismissed the Plaintiffs' cause of action against Deaton and Dominic, this action alone cannot support a finding of nondischargeability in this forum. The evidence therein reveals only that the state cause of action was dismissed; glaringly absent is any underlying evidence, particularly the affidavits of Deaton or Dominic, which led the Supreme Court to reach the decision it did. Unanswered is the question of whether the cause of action was dismissed because the Supreme Court believed that plaintiffs could not sustain an action on the note itself, or because as a matter of agency law, Debtor had no authority to act on Deaton and/or Dominic's behalf? From the record presented, the Court cannot find, based upon clear and convincing evidence, that Debtor defrauded

Plaintiffs when he executed the note, and thereafter, confessed to judgment, so as to render his obligation to them nondischargeable in bankruptcy.

■ Similarly, the record fails to substantiate Plaintiffs' allegations that Debtor's obligations to them resulted from a breach of a fiduciary duty. As an officer of Ecoworks, Debtor was to discharge his duties in good faith and with that degree of diligence, care, and skill which an ordinarily prudent person would exercise under similar circumstances in like positions. N.Y. Bus. Corp. Law, §§ 715, 717 (McKinney 1986). When analyzing whether there has been a breach of the duty of care, a court is not to second-guess the business judgment of an officer if he has acted in good faith on available information. *Auerback v. Bennett*, 47 N.Y.2d 619, 419 N.Y. S.2d 920, 393 N.E.2d 994 (1979).

■ Debtor testified he contacted at least two lending institutions concerning loans for which the delayed payment contracts were to serve as collateral. Debtor stated he made financial arrangements with Key Bank, and that the Bank of New York wanted personal guarantees from corporate principals prior to lending additional monies. Debtor said he discussed these arrangements with the other principals.

Further, Debtor testified Ecoworks needed promotional activity to stimulate flagging sales in the face of adverse public reaction to the formaldehyde scare associated with foam insulation. In retrospect, the promotion selected did not generate the desired results, yet this evidence alone fails to substantiate Plaintiffs' claim that Debtor breached his fiduciary duty.

As a result of the foregoing, it is

ORDERED:

1. The Debtor's obligations due Henry Strunk and John Sustare are dischargeable.