**IN RE: John C. SCIALDONE, Debtor.**

**Stephen Ardizzone and Simon Posen, Plaintiff(s),**

v.

**John C. Scialdone, et al., Defendant(s).**

**Case No. 12–36086 (CGM)**

**Adv. No. 12–09061 (CGM)**

United States Bankruptcy Court, S.D. New York.

Signed June 18, 2015

---

Davidoff, Hutcker & Citron, LLP, 605 Third Avenue New York, New York 10158, Attorneys for Plaintiffs, By: Michael Wexelbaum, David H. Wander

Lettera Mosiello, LLP, 2900 Westchester Avenue, Suite 200, Purchase, New York 10577, Attorneys for Defendant, By: Bruno V. Gioffre, Jr.

## MEMORANDUM DECISION DENYING DISCHARGEABILITY OF A DEBT UNDER § 523(a)(2)(A)

CECELIA G. MORRIS, CHIEF UNITED STATES BANKRUPTCY JUDGE

Plaintiffs allege that the Debtor deceived them into investing in a business in exchange for the corporation paying him a "finder's fee." They sought to have the Court find the Debtor personal liable for their full investment and that the debt be declared non-dischargeable under § 523(a)(2)(A). Because the Court finds that the Defendants did not justifiably rely on the Debtor's misrepresentations, the Court grants judgment in favor of the Defendant.

### *Jurisdiction*

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief Judge Loretta A. Preska dated January 31, 2012. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts).

### *Background*

Debtor filed for chapter 7 on April 30, 2012. The Debtor received his discharge on August 9, 2012. This adversary proceeding was filed against the Debtor on July 11, 2012 seeking a judgment from this Court determining that the money they invested in a company on Defendant's advice is non-dischargeable pursuant to § 523(a)(2)(A) and (B).

The Plaintiffs, Simon Posen ("Posen") and Stephen Ardizzone ("Ardizzone"), worked with the Defendant, John Scialdone ("Debtor" or "Defendant") at the New York Mercantile Exchange from the late 1990s until 2008 when the Debtor ceased working there. *See* Jan. 9, 2015

Trial Tr. 11:8–24:4 (Debtor testifying that he met Ardizzone sometime between 1996 and 1998); Jan. 7, 2015 Trial Tr. 201:15 (Posen testifying that as of the date of the trial in this case he had known the Debtor for about 15 years). Debtor worked for Ardizzone for a few years in the late 1990s. *See* Jan. 9, 2015 Trial Tr. 11:8–24:4. Debtor and Posen had taken a trip to Las Vegas together. *See* Jan. 7, 2015 Trial Tr. 253:8–9.

In the beginning of 2007, the Debtor's brother, Scott Scialdone ran into a childhood friend, Susan Mocerino ("Mocerino"). *See* Jan. 8, 2015 Trial Tr. 215:25. She told him she ran a telecommunications business called MJ Communications Ltd. ("MJ Communications"). *Id.* at 218–222. He and his brother became involved in the business and subsequently solicited investments from the Plaintiffs. *See* Jan. 9, 2015 Trial Tr. 32:5–38:6. Plaintiffs invested a total of $2.5 million with Mocerino or MJ Communications.[1] Prior to investing, Plaintiffs attended meetings regarding the current and future business plans of MJ Communications and each went on a business trip on behalf of the company; Posen went to the Dominican Republic and Ardizzone to Dubai. *See* Jan. 7, 2015 Trial Tr. 212:8–213:25 (Posen testifying about his trip); Jan. 8, 2015 Trial Tr. 26:19–29:8. (Ardizzone stating "I made the introductions and John did most of the talking. I actually was very impressed with how much he knew about the business at that point. Obviously there's a language that that industry speaks to one another and John knew what he was talking about and vice versa. They made a comment to me after the meeting that they had every in-

tention of doing business with us. They seen [sic] that we were able to deliver what we said we were going to deliver. They liked the deal on a very high level and when we said we'd be dealing with AT & T and the top firms in the United States that's what appealed to them and that we were able to do the capacity that we can and my friendships with the government there they trusted me implicitly so, they were ready to sign a contract.").

Sometime after investing in MJ Communications, the Plaintiffs learned that Debtor had received money from Mocerino. *See* Jan. 7, 2015 Trial Tr. 220:9. This made them uncomfortable with the investment and they demanded a refund from her. *Id.* at 222:14–24. Ardizzone then sued the Debtor and a number of others seeking a return of his investment. Jan. 8, 2015 Trial Tr. 46:7–21. That action was stayed as to the Debtor by this bankruptcy filing. *Id.* at 46:25.

Prior to trial, the parties stipulated to the following facts in the joint pre-trial order.

On February 6, 2007, Posen invested $600,000 with Susan Mocerino ("Mocerino"). *See* Joint PTO ¶ 1, ECF No. 27 (stipulated fact). On March 2, 2007, Posen invested an additional $400,000 with Mocerino. *Id.* ¶ 2. On April 19, 2007, Ardizzone invested $1.5 million with Mocerino. *Id.* ¶ 3. In April 2007, after Ardizzone's investment with Mocerino, Posen received $500,000.00 from Mocerino. *Id.* ¶ 7.

On February 12, 2007, Debtor and/or his agents or assigns, including Oracle Trading Corp.[2] ("Oracle"), received $200,-

---

1. The parties refer to Mocerino and her business MJ Communications interchangeably. No one has objected to this and so for purposes of this decision, the Court will also refer to them as one in the same.

2. Debtor is the President of Oracle, which operates as a trading company at the New York Mercantile Exchange. The parties refer to the Debtor and Oracle interchangeably as well. It appears that Debtor did not receive any money from Mocerino or MJ Communi-

000.00[3] from Mocerino. *Id.* ¶ 4. On April 23, 2007, Debtor, and/or his agents or assigns, including Oracle, received $167,000.00 from Mocerino. *Id.* ¶ 5. On April 23, 2007, Debtor, and/or his agents or assigns, including Oracle, received $67,000.00 from Mocerino. *Id.* ¶ 6. On or about May 1, 2007, Debtor, and/or his agents or assigns, including Oracle, received $322,000.00 from Mocerino. *Id.* ¶ 8.

On or about July 19, 2007, the Debtor, through Oracle, invested $465,000.00 into Crossfire Telecommunications LLC (a/k/a Crossfire Technologies LLC) ("Crossfire"). *Id.* ¶ 9.

Prior to trial, the Court held a hearing and dismissed all causes of action and all defendants except for the Plaintiffs' first cause of action against the Debtor—declaring the debt non-dischargeable under § 523(a)(2)(A). *See* Jan. 6, 2015 Hr'g Tr. (explaining why all other defendants and causes of action were dismissed).

### Discussion

At trial and in the post-trial memorandum, Plaintiffs argue that Debtor used his existing relationship with the Plaintiffs to convince them to invest in a business venture that Debtor knew to be non-existent[4] or otherwise not legitimate. Debtor allegedly had a personal interest in business and would receive a portion of each investment. Plaintiffs are seeking to except the debt owed to them from discharge, pursuant to § 523(a)(2)(A).

Section 523(a)(2)(A) states: "A discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). Most courts have held that it is not necessary that the property actually be gained for the direct benefit of the debtor. Even an indirect benefit to the debtor may constitute "obtaining property" within the meaning of section 523(a)(2)(A). False pretenses, false representation, and actual fraud are three independent causes of action—each requiring proof of the different elements. *DRCK, LLC v. Chong (In re Chong)*, 523 B.R. 236, 243 (Bankr.D.Colo.2014).

To have a debt determined to be non-dischargeable for fraud under the Bankruptcy Code, the five elements that must be established are: (1) the debtor must make an express or implied false representation; (2) the representation must be made with knowledge that it was false at the time it was made; (3) the false representation must be made with the intent to deceive; (4) the creditor must have [justifiably][5] relied upon the debtor's misrepresentation(s); and (5) the creditor must establish that he was damaged.

---

cations directly. All funds were paid to Oracle. It is not clear to the Court that the Debtor is liable for the actions of Oracle. However, the Defendant has not raised that issue and the Court need not decide it. The Court assumes for purposes of this decision that Debtor would be personally liable for monies paid to Oracle.

3. Defendant testified that this was the repayment of a loan he had previously made to Mocerino.

4. The Court finds that MJ Communications did exist—but was not generating the kind of profits the Plaintiffs were promised.

5. Although this case states that reliance must be reasonable, the Supreme Court subsequently established the appropriate standard is justifiable reliance. *Field v. Mans*, 516 U.S. 59, 77, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

*Page v. Carozza (In re Carozza)*, 167 B.R. 331, 336 (Bankr.E.D.N.Y.1994); *see also Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr.E.D.Pa.2006). False pretenses are "implied misrepresentations intended to create and foster a false impression." *Chong*, 523 B.R. at 243 (internal citations omitted). "False pretenses can be defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor." *Id.* at 243–44. Actual fraud occurs "when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right." *Id.* Thus, a showing of intent to defraud, justifiable reliance, and causation of loss must be made in order to recover under any component of section 523(a)(2)(A). *See id.*; *Wymard v. Ali (In re Ali)*, 321 B.R. 685, 690 (Bankr.W.D.Pa.2005). Plaintiffs had the burden of proving each of these elements by preponderance of the evidence at trial. *Id.*

### Express or implied representation

■ In order to satisfy the first and second elements, that the Debtor made an express or implied false representation, Plaintiffs must show that the representation "encompass[es] statements that falsely purport to depict current or past facts." *Kuper v. Spar (In re Spar)*, 176 B.R. 321, 327 (Bankr.S.D.N.Y.1994). "A promise to perform in the future is insufficient." *Id.*

■ Here, Plaintiffs argue that the Debtor made three misrepresentations: 1) that he invested a million dollars in MJ Communications; 2) that he presented the Plaintiffs with a false tax return; and 3) that he presented the Plaintiffs with an advertising brochure of the company that contained false information. Post–Trial Br. 76–77. Plaintiffs had the burden of

proving the Defendant made these misrepresentations by a preponderance of the evidence. As to the first misrepresentation, it is clear that the Defendant did make an express or implied representation that he invested money in MJ Communications when he did not. *See* Jan. 9, 2015 Trial Tr. 163:17–164:10 (testimony of John Scialdone stating that he told Steven Ardizzone he invested with Mocerino). While Plaintiffs' contend that they were told the Debtor invested $1 million, the Debtor admitted to telling Mr. Ardizzone that he "gave" Mocerino $200,000 in MJ Communications when in fact he never invested any money in the company. *Id.*; *see also* 191:22–192:24. Defendant argues that the $200,000 payment was a loan. *Id.*

Even if the Court were to accept the Defendant's testimony as true, the fact that Defendant told Mr. Ardizzone that he "gave" money to Mocerino is an implied misrepresentation that he knew to be false at the time it was made. Thus, the first and second elements are satisfied as to this representation.

As to the tax return, Plaintiffs and Defendants stories vary. The Plaintiffs testified that Debtor showed Ardizzone and Posen the tax return to convince them to invest in MJ Communications. *See* Jan. 8, 2015 Trial Tr. 21:17–22:9 (Ardizzone recounts seeing the tax return); Jan. 7, 2015 Trial Tr. 215:14–216:5 (Posen recounting seeing the tax return). Each Plaintiff states that he expressed concerns over the numbers contained therein and that the Defendant provided an explanation, which they accepted. *See* Jan. 8, 2015 Trial Tr. 23:11–16 (Ardizzone testifying that he discovered the inaccuracy); Jan. 7, 2015 Trial Tr. 237:12–238:13 (Posen testifying that he discussed the inaccuracies with the Debtor). Defendant testified that Ardizzone called the Defendant to his office where a heated conversation took place regarding

the accuracy of the document. *See* Jan. 9, 2015 Trial Tr. 188:5–189:14. Defendant states that Ardizzone had been informed by an accountant that the return was inaccurate. *Id.* Following this, Scott Scialdone contacted the accountant whose name appears on the documents and the authorities became involved. Jan. 8, 2015 Trial Tr. 134:14 (Ardizzone testifying that Debtor showed him the return and Scott and John spoke to the CPA on the false tax return and Scott and that the return was ultimately reported to the District Attorney); 190:7–24 (Cozzi testifying that John and Scott informed him they had contacted the District Attorney about the false tax return).

None of the witnesses gave particularly credible testimony regarding this tax return and ultimately, it is one's word against another. *See* Jan. 7, 2015 Trial Tr. 31:25 (Susan testifying that John Scialdone prepared the false tax return); 234:12–14 (Posen testifying that he did not know who prepared the tax return); Jan. 8, 2015 Trial Tr. 244:22–245:15 (Scott Scialdone testifying that John told Ardizzone of the discrepancies on the tax return); *see also* Jan. 9, 2015 Trial Tr. 72:17–22 (John Scialdone testifying that Ardizzone told him the tax return was false). However, considering all the evidence together, Plaintiffs' testimony was more credible. The Court finds that the Defendant showed the document to the Plaintiffs with knowledge that the information contained within was false.

As to the brochure, the Plaintiffs did not provide sufficient evidence at trial to demonstrate that the Defendant knew it contained false information at the time he showed it to them. It appears that Marcello prepared the brochures without assistance from the Debtor. *See* Jan. 7, 2015 Trial Tr. 36:9–13.

*Intent to deceive*

As to the third element, that the false representation was made with the intent to deceive, Plaintiffs must show that the Debtor acted with actual intent or was reckless in disregarding the truth of a representation. *See Danvers Savs. Bank v. Alexander (In re Alexander)*, 427 B.R. 183, 195 (Bankr.D.Mass.2010). "[T]he scienter element of a Code § 523(a)(2)(A) claim can be inferred from the totality of the circumstances because direct proof of a debtor's state of mind is generally not available." *In re Spar*, 176 B.R. at 328. As Judge Conrad Duberstein said, "actual intent may be inferred from the debtor's actions . . . and may be proven by circumstantial evidence since a debtor is unlikely to testify that his intent was fraudulent." *Bank of India v. Sapru (In re Sapru)*, 127 B.R. 306, 316 (Bankr.E.D.N.Y.1991). "The debtor's fraudulent intent may be inferred from a misstatement of fact which the debtor knows or should know will induce the creditor to act." *Strunk v. Wood (In re Wood)*, 75 B.R. 308, 313 (Bankr. N.D.N.Y.1987). Intent to deceive has also been found where a debtor recklessly disregards the truth of the representation. *Palmacci v. Umpierrez*, 121 F.3d 781, 789 (1st Cir.1997).

Here, it is clear that the Defendant recklessly disregarded the truth of his representation and knew or should have known that telling Plaintiffs that he "gave" money to Mocerino would induce them to invest. *See* Jan. 7, 2015 Trial Tr. 102:23–25 (Mocerino testifying); 255:1–4 (Posen testifying); Jan. 8, 2015 Trial Tr. 16:10–14, 21:2–8 (Ardizzone testifying that the Scialdones said they invested $1 million); Jan. 9, 2015 Trail Tr. 192:18–24 (John Scialdone testifying: "I explained why I gave her the money. I said she was floating her route, so I was basically helping her float the route . . . . we didn't discuss that invest-

ment/loan. That never came up."). Similarly, Defendant appears to have showed the Plaintiffs the tax return in order to convince them to invest in MJ Communications. Thus, this element is met.

### Justifiable reliance

▮ As to the fourth element, it is important to note that the standard is "justifiable" reliance as opposed to "reasonable" reliance. The appropriate inquiry is not whether a reasonable person would have relied on the debtor's false statements; it is not objective. Instead, the question is whether the named creditor's reliance was "justifiable;" it is a subjective standard. *See Chong,* 523 B.R. at 245.

Debtor argues in his post-trial brief that "[i]t is well established that where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *See Terra Sec. ASA Konkursbo v. Citigroup, Inc.,* 450 Fed.Appx. 32, 34 (2d Cir.2011) (citing *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1541 (2d Cir.1997)). It is true that under New York law, Plaintiffs might have a difficult time sustaining a claim for fraud against the Debtor. The Plaintiffs are sophisticated business men as each worked on the trading floor of the New York Mercantile Exchange. *See Crigger v. Fahnestock & Co., Inc.,* 443 F.3d 230, 233 (2d. Cir.2006) (computer programmers turned overnight millionaires, who invested in a *Ponzi* scheme, were considered "sophisticated investors" based on the fact that they traded in options and commodities, including silver, soybeans, wheat, and corn), and invested in several real-estate and film-production tax shelters). Because this is a somewhat looser standard than set forth by the Supreme Court in

*Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the Court will interpret the Plaintiff's reliance under the stricter standard.

▮ Under *Field,* a plaintiff need not perform his own investigation of the facts underlying the representation in order to have justifiably relied on it but he also may not blindly rely on a misrepresentation if a cursory investigation would have uncovered the truth. *Field,* 516 U.S. at 70–71, 116 S.Ct. 437. While a plaintiff is entitled to rely on the veracity of financial documents provided by the debtor, a duty to investigate on his own arises once he receives an indication of deception. *See OSB Mfr., Inc. v. Hathaway (In re Hathaway),* 364 B.R. 220, 236 (Bankr.E.D.Va. 2007); *see also In re Haras,* 526 B.R. 435, 440 (Bankr.D.Mass.2015) ("For purposes of determining whether reliance was justified, the circumstances of the reliance claim must be taken into account, and the individual is not obliged to investigate statements made to him (although he cannot shut his eyes to an obvious falsehood).").

▮ Ardizzone testified that in February of 2007, the Debtor showed him a document that was purported to be the most recent tax return for MJ Communications. *See* Jan. 8, 2015 Trial Tr. 21:24–23:23. At that meeting, the parties discussed that some of the numbers were "transposed" and that the accountant made a manual mistake. *See id.* 23:11–16 ("MR. WEXELBAUM: Did you have any discussion about the numbers on lines 29C and 30 not being in the correct order? MR. ARDIZZONE: Yes. You know, I explained that they were transposed and it just looked like a manual mistake, but I did understand what the numbers would be."). It is important to note that Ardizzone does not state that the Debtor told him there was a mistake in the document.

Instead, he states that he discovered the discrepancy on his own. *Id.*: 14–21 ("MR. ARDIZZONE: ... He said look how much money we could make. Let me show you her tax return. Let me—he circled it and showed me the gross sales, pointed to a line. When I read through it I realized that it was, you know, there were numbers that were transposed, but it didn't matter. He was convinced that this was her tax return and we were going to make this kind of money."). It turns out that the document Ardizzone viewed was not the actual tax returns for MJ Communications; it was a fake return meant to make it look like MJ Communications had more money than it did.

Ardizzone was aware of this tax return prior to investing in MJ Communications. Until the point of seeing the errors contained in the tax return, Ardizzone was entitled under § 523(a)(2)(A) to rely on the representations made by the Debtor. However, once he became aware of the inaccuracies contained within the document, he could no longer blindly rely on the Debtor's representations. After that point, he had a duty to investigate whether the tax return accurately reflected the profits and losses of MJ Communications. Had he asked for the final version of this return or prior years returns, he would have surely discovered that MJ Communications did not make anywhere near the numbers contained in the fraudulent return. Having failed to undertake this investigation, he cannot now say that his reliance on the Debtor's representations was justified.

Posen also testified that he saw that the numbers of the tax return were not accurate. *See* Jan. 7, 2015 Trial Tr. 237:12—238:13 ("MR. GIOFFRE: ... Did you happen to notice that although the $53 million is in that spot where it's not supposed to be, as counsel had just indicated?

MR. POSEN: Yes. MR. GIOFFRE: And did that give you rise to this particular document, when it was provided to you, that it might not be accurate? MR. POSEN: It was my understanding, that this was a draft.... MR. GIOFFRE: A draft, okay. And whose understanding is that, or how did you come to that understanding? MR. POSEN: I discussed it with John. MR. GIOFFRE: And what did John say? MR. POSEN: He gave me a very good explanation. I can't tell you word for word what he said, but he made me feel comfortable, that it was—he'd given the explanation. MR. GIOFFRE: Can you recall any words of what he said, with the explanation? MR. POSEN: Not off of the top of my head."). Posen did not see the tax return prior to making his initial investment of $600,000 but did see it prior to making his investment of $400,000. *Id.* at 212:3–6 ("MR. WEXELBAUM: Were you ever shown a tax return prior to your making your initial investment in Susan Mocerino's company? MR. POSEN: No."); 215:14–20 ("MR. WEXELBAUM: Now, after you made the initial investment of $600,000 in Susan Mocerino's company, were you shown a tax return for that company? MR. POSEN: Yes. MR. WEXELBAUM: And was that before you invested the second tranche of $400,000? MR. POSEN: I believe so."). The inaccuracies contained in the tax return are undoubtedly an indication of deception and once he learned of them, Posen had a duty to investigate further. Instead, he chose to invest an additional $400,000. Having failed to investigate, Posen cannot now argue that his reliance is justifiable as to this $400,000 investment.

### Whether creditor was damaged

Having just determined that Ardizzone and Posen cannot have justifiably relied on Debtor's representations after becoming aware that the Defendant tried

to pass off erroneous tax returns as genuine, the Court need only consider whether Posen was damaged with regard to his initial $600,000 investment. Because Posen reinvested or was refunded all of his initial $600,000 investment, the Court finds that he suffered no damages.

Posen testified that after he became aware that the Defendant received monies from Mocerino, he confronted Mocerino she refunded him $500,000. *See* Jan 7, 2015 Trial Tr. 221:22–222:2 ("MR. WEXELBAUM: Did you subsequently receive a refund of any sort from the monies you had invested with 24 Susan Mocerino? MR. POSEN: I did. MR. WEXELBAUM: And how much was refunded to you? MR. POSEN: $500,000."). He also confronted the Debtor and the testimony of all the parties indicated that Posen and the Debtor agreed to settle this debt by forming Crossfire.

Posen re-invested the $500,000 debt he believed the Debtor still owed[6] to him into Crossfire in exchange for a share of its profits. *See id.* 224:21–225:16 ("MR. POSEN: Because John Scialdone was aware that I had—I was still owed half a million dollars. And he wanted to set up a company in the communications field, and told me that he would make sure that I get my other half a million dollars back by getting it back doing business in this company."); *id.* at 226:1–9 ("MR. POSEN: John Scialdone would be the main—would be the principle, the main investor, and that he would—he told me that he would be—I wouldn't have to put money up, but that I would—he was well aware that I was still out half a million dollars, and that when the company made money, that he would be able to take some of the profits and then give them to me, to make sure I got, you know, (indiscernible) from my initial investment in MJ Communications").

Posen was involved in the formation of Crossfire and the company was formed by Posen's accountant at his behest. *Id.* Posen testified that he was "happy to receive" profits from Crossfire as long as he did not have to invest any money. *Id.* at 266:11–14. He believed himself to be a "passive investor" in Crossfire for the purpose of recouping his investment in MJ Communications. *See id.* at 270:3–5.

As for the Debtor's part of this deal, he invested the $465,000 that he personally received from Mocerino to fund Crossfire. In July 2007, Defendant made the initial investment in Crossfire of $465,000 by writing a check to Crossfire from his company, Oracle Trading Corp. *Id.* at 227:9–228:1; *see also* Trial Ex. 9 (check from Oracle to Crossfire). In this way, the Debtor turned over to Posen, by way of Crossfire, all of the monies he received from Mocerino. *See* Jan. 9, 2015 Trial Tr. 113:2–13 (Since Posen and the Defendant agreed to this deal after Posen became fully aware of all of the Debtor's misrepresentations, he can no longer argue that he was defrauded by the Debtor. Instead, he made a business decision to invest in Crossfire. *See* Jan. 8, 2015 Trial Tr. 252:16–19 (Scott Scialdone testifying[7] "Mr. Posen formed Crossfire and, again, I'm sure out of frustration and seeing the whole business plan, the amounts of money that could be made it made sense to move forward.").

---

6. The Court makes no legal finding as to whether this $500,000 was owed to Posen by the Debtor. The Court simply finds that the Debtor and Posen seem to agree that it was owed and created a new business as a way for him to recoup this money.

7. The transcript has a transcription error; from the transcript it appears like Debtor's counsel is testifying when in fact Scott Scialdone is answering the question posed by counsel.

Even though Posen ultimately decided not to continue with Crossfire and transferred the company to the Debtor's name, he made the initial decision to invest in Crossfire with full knowledge of the Debtor's misrepresentations. *See* Jan. 8, 2015 Trial Tr. 225:11–226:24 ("MR. WEXELBAUM: And were you supposed to be a principle in that company, along with him? MR. POSEN: Yes." ... "MR. WEXELBAUM: ... and after you decided not to go forward with the Scialdones and the Crossfire business, what was done with Crossfire? MR. POSEN: My accountant transferred the company to John Scialdone's name."). He had serious doubts about the Debtor prior to starting Crossfire and had hired lawyers to recover his investment in MJ Communications. *Id.* at 223:2–5 ("MR. WEXELBAUM: Did you get lawyers involved in your efforts to recover your investment? MR. POSEN: Within weeks of investing, I got my attorneys involved, yes. MR. WEXELBAUM: And who are your attorneys? MR. POSEN: Pryor Cashman."). Thus, Posen cannot claim that his investment in Crossfire was made under any deceptive circumstances. It was simply a bad business decision that cannot be remedied under § 523(a)(2)(A).

### Conclusion

For the foregoing reasons, the Court finds that Plaintiffs have failed to meet their burden of showing justifiable reliance and damages. The Defendant shall submit an order consistent with this decision.